**1**

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TERRENCE BARBER,                          )
                                          )
        Plaintiff,                        )
                                          )
    vs.                                   )    No. 08-CV-6363
                                          )    Judge Anderson
P.O. Michael Malaniuk (#11652),           )    Magistrate Judge Keys
P.O. Michael Shields (#5951),             )
individually and THE CITY OF              )
CHICAGO,                                  )
                                          )
        Defendants.                       )

THE DEPOSITION OF TERRENCE BARBER, reported by Lisa
J. Doerr, Illinois CSR 084-004304, on January 25, 2010,
commencing at the hour of 1:00 p.m. at 100 Hillcrest Road,
in the City of East Moline, State of Illinois.

**2**

1   APPEARANCES:
2
3       ED FOX & ASSOCIATES
4       MR. JONATHAN KSIAZEK
5       300 W. Adams, Suite 330
6       Chicago, IL 60606
7       (312) 345-8877
8           appearing on behalf of the Plaintiff;
9
10      JOHNSON & BELL
11      MR. BRIAN P. GAINER
12      33 W. Monroe
13      Chicago, IL 60603
14      (312) 372-0770
15          appearing on behalf of the Defendants.
16
17
18
19
20
21
22
23

**3**

1                    I N D E X
2   WITNESS                              Page
3
4   TERRENCE BARBER
5
6   Examination by Mr. Gainer              5
7   Examination by Mr. Ksiazek           170
8   Further examination by Mr. Gainer    173
9
10
11
12
13
14
15
16   EXHIBITS
17
18
19   Exhibit No. 1 marked for identification   129
20   Exhibit No. 2 marked for identification   145
21   Exhibit No. 3 marked for identification   147
22
23       (Attached.)

**4**

1           TERRENCE BARBER,
2   having been first duly sworn was examined and
3   testified as follows:
4
5           MR. GAINER:  Sir, can you please state
6   your full name and spell your last name for the
7   record.
8           THE WITNESS:  Terrence Barber.
9           MR. GAINER:  Spell your last name,
10  please.
11          THE WITNESS:  B-a-r-b-e-r.
12          MR. GAINER:  Can you also spell your
13  first name for me.
14          THE WITNESS:  T-e-r-r-e-n-c-e.
15          MR. GAINER:  Do you have a middle
16  initial?
17          THE WITNESS:  D.
18          MR. GAINER:  Okay.  Let's let the
19  record reflect that this is the deposition of
20  Terrence D. Barber, being taken pursuant to
21  notice and pursuant to court order in this case.
22  The deposition is being taken in East Moline
23  Correctional Center.  This is being taken also in

---

**5**

1   accordance with all the Federal Rules of Civil
2   Procedure that apply, and any local rules that
3   apply.
4
5                    EXAMINATION
6                  BY MR. GAINER
7       Q.    Mr. Barber, my name is Brian Gainer, I
8   represent the defendants in the lawsuit that you
9   filed against the City of Chicago, the Chicago
10  Police Department, and certain Chicago police
11  officers. Have you ever given a deposition
12  before?
13      A.    No.
14      Q.    Okay. First and foremost, I'm going
15  to ask you to keep your voice up a little bit
16  louder, because as you can see, to your right
17  here, there's a court reporter writing everything
18  down.
19      A.    Okay.
20      Q.    We're going to get a written record of
21  this later on, and so I want to make sure that
22  the court reporter can hear what you're saying so
23  that when we're reading it later, we can

---

**6**

1   understand what we talked about today. Okay?
2       A.    All right.
3       Q.    I'm going to give you a couple more
4   ground rules just to kind of make this flow as
5   smoothly as possible. First and foremost, when I
6   ask you a question that requires a yes or no
7   answer, I would ask that your answer be yes or
8   no, depending on what you want to say, because if
9   you say uh-huh or huh-uh, or nod your head, or
10  shake your head, that doesn't show up well in the
11  transcript. Okay?
12      A.    Yes, sir.
13      Q.    All right. In addition to that, if I
14  ask you a question at any time today and you
15  answer it, I'm going to assume that you
16  understood my question. So if at any time you
17  don't understand what I'm saying, feel free to
18  tell me to rephrase whatever my question is, and
19  I'll do that. Okay?
20      A.    Okay.
21      Q.    Also, this is the hardest one,
22  especially for me, because the court reporter's
23  typing everything down, it really doesn't work

---

**7**

1   out well if we talk over each other. So please
2   try to wait until I'm finished with my question,
3   even if you know where I'm going, before you
4   start giving your answer, and likewise, I'll try
5   to wait until you're finished with your answer
6   before I start the next question. Okay?
7       A.    Yes, sir.
8       Q.    At any time you need to take a break,
9   just let me know. Okay?
10      A.    Yes, sir.
11      Q.    Mr. Barber, how old are you?
12      A.    19 -- 18.
13      Q.    What's your birthday?
14      A.
15            MR. KSIAZEK: Just make sure to keep
16  speaking up.
17            THE WITNESS: Okay.
18  BY MR. GAINER:
19      Q.    Before you came to East Moline
20  Correctional Center, where did you live?
21      A.    1170 West Aerie.
22      Q.    In an apartment there?
23      A.    Yes, apartment building.

---

**8**

1       Q.    What apartment did you live in?
2       A.    404.
3       Q.    How long did you live at 1170 West
4   Aerie, in apartment 404?
5       A.    For, like, I'd say, a year and, like,
6   six months.
7       Q.    Okay. Who did you live there with?
8       A.    The mother of my child.
9       Q.    The mother of your child?
10      A.    Yes.
11      Q.    What's her name?
12      A.    Dominique Stephson.
13      Q.    What's her last name?
14      A.    Stephson.
15      Q.    Stephson?
16      A.    Yeah.
17      Q.    Do you know how to spell that?
18      A.    S-t-e-p-h-s-o-n.
19      Q.    Okay. Is that your apartment or her
20  apartment?
21      A.    Her apartment.
22      Q.    All right. You mentioned that you
23  have a child?

## 9

1    A.    Yes.
2    Q.    Is it just one?
3    A.    No, I have three children.
4    Q.    Okay.  How old is the child with whom
5    you lived at 1170 West Aerie?
6    A.    One year old.
7    Q.    Boy or girl?
8    A.    Girl.
9    Q.    How old are your other children?
10   A.    My son, he's four years old, and I
11   have another daughter, she's two.
12   Q.    What's your son's first name?
13   A.    Taveion.
14   Q.    How do you spell that?
15   A.    T-a-v-e-i-o-n.
16   Q.    Your two-year-old daughter, what's her
17   name?
18   A.    Kamya.
19   Q.    How do you spell that?
20   A.    K-a-m-y-a.
21   Q.    And then the one-year-old daughter,
22   what's her name?
23   A.    Kylei, K-y-l-e-i.

## 10

1    Q.    Prior to living at 1170 West Aerie,
2    apartment 404, where did you live?
3    A.    1365 North Hudson.
4    Q.    How long did you live there?
5    A.    For, like -- for, like, about -- I'd
6    say about eight or nine years.
7    Q.    Okay.  Were you living there on
8    December 14, 2005?
9    A.    Yes, sir.
10   Q.    Okay.  Who did you live there with?
11   A.    My mother.
12   Q.    And what's her name?
13   A.    Cecile Barber.
14   Q.    Can you spell Cecile for me?
15   A.    C-e-c-i-l-e.
16   Q.    All right.  Anyone else live there
17   with you?
18   A.    My brother.
19   Q.    What's his name?
20   A.    Terry Barber.
21   Q.    Now, is his first name Terry or --
22   A.    Yes.
23   Q.    -- or is that short for Terrence?

## 11

1    A.    His first name's Terry.
2    Q.    Okay.  So it's not Terrence?
3    A.    No, it's just Terry.
4    Q.    Do you know what your brother's
5    birthday is?
6    A.
7    Q.    On December 14, 2005 --
8    A.    No, '88.
9    Q.    '88?
10   A.    Yeah.
11   Q.    So your brother's birthday is
12          .
13   A.    Yes.
14   Q.    Okay.  On December 14, 2005, was your
15   brother, Terry, living at 1365 North Hudson with
16   you?
17   A.    Yes, sir.
18   Q.    Okay.  What apartment did you live in?
19   A.    2121, Building 6C.
20   Q.    So apartment 2121?
21   A.    Yes.  The building, 6C.
22   Q.    Building 6C?
23   A.    Yes.

## 12

1    Q.    Is that some sort of housing complex?
2    A.    Yes.
3    Q.    Is it CHA?
4    A.    I'm not real sure about that.
5    Q.    Okay.  If someone were to send you a
6    letter when you were living on Hudson --
7    A.    Yes.
8    Q.    -- would they address it to 1365 North
9    Hudson, Apartment 2121, building 6C, Chicago,
10   Illinois?
11   A.    Yes, sir.
12   Q.    And obviously they'd put your name on
13   it, too?
14   A.    Yes, sir.
15   Q.    Do you have any other brothers or
16   sisters aside from Terry?
17   A.
18   Q.    What do you have, brothers or sisters?
19   A.    Brothers and sisters, but they on my
20   father's side.
21   Q.    Okay.  Why don't you just give me
22   their names real quick.
23   A.    Michael Rockmore, Michelle Rockmore,

## 13

1     Jamal Griffin.
2     Q.   I'll make it easy for you. Do you
3 have any other brothers and sisters, other than
4 your brother Terry, who has the name Terry, or
5 Terrence, or anything like that?
6     A.   No.
7     Q.   So your brother, Terry, who you've
8 already told me about --
9     A.   Yes.
10     Q.   -- is the only brother that you have
11 who has a name like yours?
12     A.   Yes.
13     Q.   Okay. What's your father's name?
14     A.   Michael Griffin.
15     Q.   And where does Mr. Griffin live?
16     A.   Champaign, Illinois. I really don't
17 know the address.
18     Q.   That's okay. Was Michael Griffin
19 living with you on December 14, 2005?
20     A.   No.
21     Q.   Other than your brother, Terry, and
22 your mom, was anyone else living with you on
23 December 14, 2005?

## 14

1     A.   No, sir.
2     Q.   Okay. Where were you born?
3     A.   Chicago, Illinois.
4     Q.   Do you remember what hospital?
5     A.   Mount Sinai.
6     Q.   Are you married?
7     A.   No.
8     Q.   Before you came to East Moline,
9 immediately before you came to East Moline, were
10 you working?
11     A.   I had a summer job.
12     Q.   What were you doing?
13     A.   I was working at Portillos Hot Dogs.
14     Q.   You said that was a summer job?
15     A.   Yes.
16     Q.   When was the last time you did that
17 job before you came here?
18     A.   I'm not sure.
19     Q.   Did you do it in the summer of 2009?
20     A.   No, I don't think so.
21     Q.   In the summer of 2008?
22     A.   Yeah, I think it was around that time.
23     Q.   Aside from the summer job at

## 15

1 Portillos, did you have any other jobs before you
2 came to East Moline?
3     A.   No, sir.
4        MR. KSIAZEK: Keep your voice up just
5 a little.
6        THE WITNESS: All right.
7 BY MR. GAINER:
8     Q.   Aside from the job at Portillos, have
9 you had any other jobs ever?
10     A.   No.
11     Q.   Prior to coming to East Moline, were
12 you in school?
13     A.   I was doing GED assignments, home
14 school, so I could be there for my children,
15 baby-sit them.
16     Q.   So before you coming to East Moline
17 Correctional Center, you were taking classes to
18 get your GED?
19     A.   Yeah, I was taking home-school
20 classes.
21     Q.   Okay. Do you have your GED?
22     A.   No, I never finished it.
23     Q.   All right. Are you taking any classes

## 16

1 here at East Moline?
2     A.   I am, but I just got here, so I really
3 ain't really got into school yet.
4     Q.   So you're not yet enrolled, but you
5 plan on taking classes?
6     A.   Yes.
7     Q.   Are you working here at East Moline?
8     A.   Yes, sir.
9     Q.   What are you doing?
10     A.   I work in the cafeteria.
11     Q.   How does that work, do they pay you?
12     A.   Yeah.
13     Q.   How much do they pay you?
14     A.   Like, 50 cents a day.
15     Q.   Okay. Are we in agreement that the
16 incident that we're here to talk about happened
17 December 14, 2005?
18     A.   Yes, sir.
19     Q.   Okay. For the next couple questions
20 -- I'm still going to ask you some background
21 questions, but I might be going back and forth a
22 little bit. So if it gets confusing, let me
23 know.

| 17 | |
|---|---|
| 1 | A. Okay. |
| 2 | Q. On December 14th, 2005, were you in |
| 3 | school? |
| 4 | A. Yes. |
| 5 | Q. Where were you going to school? |
| 6 | A. George Manierre. |
| 7 | Q. Say that one more time. |
| 8 | A. George Manierre. |
| 9 | Q. George Manierre? |
| 10 | A. Elementary school. |
| 11 | Q. Do you know how to spell Manierre? |
| 12 | A. M-a-n-i-e-r-r-e. |
| 13 | Q. What grade were you in when this |
| 14 | happened? |
| 15 | A. I think I was in 8th. |
| 16 | Q. Now, is George Manierre, as far as you |
| 17 | understand, is that an alternative school, or was |
| 18 | it just a regular Chicago public school? |
| 19 | A. No, regular Chicago public school. |
| 20 | Q. All right. I want to talk a little |
| 21 | bit, other than what we've already talked about, |
| 22 | about your education. Did you graduate from |
| 23 | George Manierre? |

| 18 | |
|---|---|
| 1 | A. Yes. |
| 2 | Q. Do you remember what year? |
| 3 | A. No, not really. |
| 4 | Q. Would it have been the same -- would |
| 5 | it have been the '05, '06 year? |
| 6 | A. Yeah. |
| 7 | Q. The year that this happened, or at |
| 8 | least the spring after this happened? |
| 9 | A. Yes. Yes, sir. |
| 10 | Q. Okay. And we talked about, you don't |
| 11 | have your GED yet, right? |
| 12 | A. Yes, sir. |
| 13 | Q. So you haven't graduated from high |
| 14 | school? |
| 15 | A. No, sir. |
| 16 | Q. What I said was correct? |
| 17 | A. Yes, sir. |
| 18 | Q. Okay. Have you taken -- other than |
| 19 | the classes you've told me about, the GED |
| 20 | classes, the home school, and the ones you intend |
| 21 | to take here, have you taken any other advanced |
| 22 | education classes? |
| 23 | A. No. |

| 19 | |
|---|---|
| 1 | Q. Have you taken any classes to try to |
| 2 | get a trade? |
| 3 | A. I really never got into it. |
| 4 | Q. Okay. Have you told me now about all |
| 5 | the jobs that you've had, the Portillos job and |
| 6 | that's it? |
| 7 | A. Yes, sir. |
| 8 | Q. Okay. Have you ever been a plaintiff |
| 9 | or a defendant in any other lawsuit other than |
| 10 | this one? |
| 11 | A. No, sir. |
| 12 | Q. So you've never shoed -- excuse me. |
| 13 | Strike that. |
| 14 | You've never sued the Chicago Police |
| 15 | Department before? |
| 16 | A. No, sir. |
| 17 | Q. And you've never been in the military? |
| 18 | A. No, sir. |
| 19 | Q. Have you been convicted of a felony? |
| 20 | A. Yes, sir. |
| 21 | Q. Okay. What felony were you convicted |
| 22 | of? |
| 23 | A. Possession of a stolen motor vehicle. |

| 20 | |
|---|---|
| 1 | Q. Okay. My records indicate you were |
| 2 | convicted of a possession of a stolen motor |
| 3 | vehicle on October 2nd, 2008; does that sound |
| 4 | right to you? |
| 5 | A. No. |
| 6 | Q. Okay. |
| 7 | A. It was July 1st. |
| 8 | Q. July 1st of what year? |
| 9 | A. 2008. |
| 10 | Q. Okay. My records indicate you were |
| 11 | sentenced to 18-months probation; is that right? |
| 12 | A. Yes, sir. |
| 13 | Q. Have you been convicted of any other |
| 14 | felonies? |
| 15 | A. No, sir. |
| 16 | Q. Are you currently in East Moline |
| 17 | Correctional Center because of the PSV charge -- |
| 18 | possession of a stolen vehicle charge? |
| 19 | A. Yes, sir. |
| 20 | Q. Did you violate your probation? |
| 21 | A. Yes, sir. |
| 22 | Q. All right. Do you know when -- and I |
| 23 | know that might be hard to give me an exact date, |

| 21 | | 23 | |
|---|---|---|---|
| 1 | so if you want to just give me a range, that | 1 | that's a proper objection in a deposition, but |
| 2 | works, too.  Do you know when the hearing was | 2 | there we go. |
| 3 | held about your violation of probation? | 3 | BY MR. GAINER: |
| 4 |     A.  October 29, 2009. | 4 |     Q.  Is that the only felony, this PSMV, |
| 5 |     Q.  And that's when you were sentenced to | 5 | that you've been convicted of? |
| 6 | come here? | 6 |     A.  Yes, sir. |
| 7 |     A.  No. | 7 |     Q.  And they haven't told you a possible |
| 8 |     Q.  That was a bad question.  That's when | 8 | release date? |
| 9 | you were sentenced to go into the Illinois | 9 |     A.  No.  We have to wait here for our |
| 10 | Department of Corrections? | 10 | calculation sheet. |
| 11 |     A.  Yes.  No.  No.  No.  I had -- I was in | 11 |     Q.  I see.  Okay.  I don't know if you |
| 12 | Cook County jail. | 12 | know this, and if you don't, that's okay.  Do you |
| 13 |     Q.  Right.  And then they had a hearing on | 13 | have idea whether you're going to be moving to |
| 14 | your violation of probation? | 14 | another facility? |
| 15 |     A.  Yeah. | 15 |     A.  No. |
| 16 |     Q.  And then they found that you had | 16 |     Q.  They didn't tell you that you're going |
| 17 | violated your probation? | 17 | to stay here? |
| 18 |     A.  Yes. | 18 |     A.  Yeah, I think I'll be doing the |
| 19 |     Q.  And they sentenced you to Department | 19 | remainder of my time here. |
| 20 | of Corrections? | 20 |     Q.  Okay.  To the best of your knowledge |
| 21 |     A.  That wasn't until December 16th. | 21 | anyway? |
| 22 |     Q.  Of 2009? | 22 |     A.  Yes. |
| 23 |     A.  Yes. | 23 |     Q.  Is this the first time you've ever |

| 22 | | 24 | |
|---|---|---|---|
| 1 |     Q.  So that's when they sentenced you? | 1 | before been in prison? |
| 2 |     A.  Yes. | 2 |     A.  Yes, sir. |
| 3 |     Q.  Okay.  What violated your probation? | 3 |     Q.  Have you ever been convicted of any |
| 4 |     A.  Positive urine of marijuana. | 4 | misdemeanors involving dishonesty?  And if you |
| 5 |     Q.  What did they sentence you to in terms | 5 | don't know what I mean by that, I can explain. |
| 6 | of prison time when they determined that you | 6 |     A.  Yeah, you need to explain. |
| 7 | violated your probation? | 7 |     Q.  Okay.  Have you ever been convicted of |
| 8 |     A.  18 months. | 8 | theft? |
| 9 |     Q.  Okay.  So they -- I'm sorry, go ahead. | 9 |     A.  No. |
| 10 |     A.  I think it was three years, but it's | 10 |     Q.  How about misdemeanor criminal |
| 11 | really, actually, like, cut in half. | 11 | trespass to vehicle? |
| 12 |     Q.  All right. | 12 |     A.  No. |
| 13 |     A.  So 18 months. | 13 |     Q.  Okay.  Have you ever been convicted of |
| 14 |     Q.  So when they found that you violated | 14 | any crime other than this PSMV charge, that |
| 15 | your probation, they sentenced you to 18 months | 15 | involves stealing anything? |
| 16 | IDOC? | 16 |     A.  No. |
| 17 |     A.  Yes, sir. | 17 |     Q.  Have you ever been convicted of lying |
| 18 |     Q.  Have they given you a possible parole | 18 | under oath? |
| 19 | date? | 19 |     A.  No. |
| 20 |     A.  No, not yet. | 20 |     Q.  Have you been convicted of any other |
| 21 |     MR. KSIAZEK:  I'd just object as to | 21 | crimes other than this possession of a stolen |
| 22 | character reference as regards to his conviction. | 22 | motor vehicle? |
| 23 |     MR. GAINER:  Okay.  I don't think | 23 |     A.  Just misdemeanors. |

## 25

1    Q.   Can you tell me what they are?

2    A.   Just possession of weed, marijuana.

3    Q.   How many times?

4    A.   I'm really not sure about that.

5    Q.   More than one?

6    A.   Yes.

7    Q.   Okay.  Any other crimes other than the

8 cannabis possession charges that you've been

9 convicted of?

10   A.   To my best knowledge, gambling and

11 trespassing.

12   Q.   Anything else?

13   A.   No, that's it.

14   Q.   Are you a gang member?

15   A.   No, sir.

16   Q.   Have you ever been?

17   A.   No, sir.

18   Q.   All right.  I'm going to move forward

19 now.  We're going to talk about the incident that

20 this lawsuit is based on.  Okay?

21   A.   Okay.

22   Q.   On December 14, 2005, how old were

23 you?

## 26

1    A.   How old was I?

2    Q.   Yes.

3    A.   I think I was, like, 16 at the time.

4    Q.   Prior to December 14, 2005, had you

5 been arrested before?

6    A.   Can you rephrase that?

7    Q.   Before the date of this incident,

8 December 14, 2005, had you been arrested before?

9    A.   No.

10   Q.   So this is the first time you'd ever

11 been arrested?

12   A.   Yes.

13   Q.   Do you remember the day of the week?

14   A.   I'm not really sure.

15   Q.   Okay.  Was it a weekday or weekend?

16   A.   I'm not really sure.

17   Q.   Do you remember around what time of

18 day it was that you ran into the police?

19   A.   It was around late noon, like -- it

20 had to be, like, around -- after 5:00 or

21 something like that.

22   Q.   Okay.  Was it dark out when you first

23 saw the police?

## 27

1    A.   Yes, sir.

2    Q.   All right.  I want to talk about that

3 day, before you saw the police.  Do you remember

4 what you were doing that day?

5    A.   The day before?

6    Q.   No.  No, I mean on the day,

7 December 14, 2005, before you saw the police, do

8 you remember what you were doing?

9    A.   I was in the house fixing me some

10 food.  I was going to fix me a pizza puff.

11   Q.   A pizza puff?

12   A.   Yeah.

13   Q.   You were in the -- you say you were in

14 the house, do you mean you were in the place at

15 1365 North Hudson, apartment 2121?

16   A.   Yes, sir.

17   Q.   Had you been in the house all day?

18   A.   Yes, sir.

19   Q.   You didn't go to school that day?

20   A.   I went to school.

21   Q.   You did go to school?

22   A.   Yeah.

23   Q.   At George Manierre?

## 28

1    A.   Yeah.

2    Q.   What time did school end that day?

3    A.   School ended, like, around 2:45.

4    Q.   Okay.  After 2:45, where did you go?

5    A.   Home.

6    Q.   Between -- what time do you think you

7 got home?

8    A.   I'm not really -- you say what time

9 did I get home?

10   Q.   Yeah, what time do you think you got

11 home from school?

12    MR. KSIAZEK:  Objection, speculation,

13 but go ahead and answer.

14 BY MR. GAINER:

15   Q.   What time?

16   A.   Like, around 3:00.

17   Q.   Okay.  Did you stay in the house then

18 from 3:00 until the time you saw the police?

19   A.   Yes, sir.

20   Q.   Do you remember what you were doing,

21 other than making yourself some food in the

22 house, between 3:00 and the time you saw the

23 police?

## 29

1    A.   Just playing a video game.
2    Q.   Were you with anyone?
3    A.   My brother.
4    Q.   Your brother, Terry?
5    A.   Yes.
6    Q.   Is his last name Barber?
7    A.   Yes.
8    Q.   Was there anyone else with you?
9    A.   No, not really.
10   Q.   Was your mom home?
11   A.   No, she was at work.
12   Q.   Okay.  Do you remember where your mom
13 worked at the time?
14   A.   Best Buy.
15   Q.   Between 3:00 -- around 3:00, when you
16 got home, and the time you ran into the police,
17 did you have any alcoholic drinks?
18   A.   No.
19   Q.   Did you do any drugs?
20   A.   No, sir.
21   Q.   Were you on any medication at that
22 time?
23   A.   No.

## 30

1    Q.   And I don't mean to ask stuff like
2 that, I mean any medication that had been
3 prescribed to you?
4    A.   No, sir.
5    Q.   How old was your brother, Terry, on --
6 around this time, do you remember?
7    A.   I'm not sure.  I think around, like,
8 18 or 19.
9    Q.   Okay.
10   A.   Yeah, like 18.
11   Q.   Where does your brother, Terry, live
12 now?
13   A.   He lives with my mother, like, off and
14 on.
15   Q.   Okay.
16   A.   With my mother and with my aunt.
17   Q.   Where does your mom live now?
18   A.   She lives in Mt. Prospect, Illinois.
19   Q.   Do you know the address?
20   A.   1505 West Cottonwood.
21   Q.   Cottonwood did you say?
22   A.   Yeah, Cottonwood.
23   Q.   So sometimes your brother, Terry,

## 31

1 stays with her, sometimes he stays with your
2 aunt?
3    A.   Yes.
4    Q.   Okay.  At some point, on December 14,
5 2005, you went outside, right?
6    A.   Yes.
7    Q.   About what time do you think you went
8 outside?
9    A.   I think it was, like, around, like,
10 4:45. I got a call from my mother to tell me to
11 come downstairs.
12   Q.   Tell me about that.  Your mom called
13 you to come downstairs you said?
14   A.   Yes, to help her with the groceries.
15   Q.   Okay.  When she called you and told
16 you to come downstairs, where did you think that
17 she wanted you to go?
18   A.   At the front of the building, 1365
19 North Hudson.
20   Q.   Did you go downstairs to meet your
21 mom?
22   A.   Yes, but she wasn't there yet.  She
23 was on her way coming.

## 32

1    Q.   And this was around 4:45?
2    A.   Yes.
3    Q.   All right.  When you went downstairs
4 did you see anybody?
5    A.   No.
6    Q.   Did you talk to anybody?
7    A.   No, just the mother of my baby, she
8 came down with me.
9    Q.   Okay.  Had she been in your apartment?
10   A.   Yes, only for like a couple minutes
11 though.
12   Q.   Did she also live in 1365 North Hudson
13 building?
14   A.   No.  I think she lived over on 624
15 West Mohawk.
16   Q.   Mohawk or Blackhawk?
17   A.   Mohawk.
18   Q.   Okay.  And what's her name?
19   A.   Isis Walker.
20   Q.   Which of your children is hers?
21   A.   Taveion Barber.
22   Q.   That's the four-year-old son?
23   A.   Yes, sir.

---

33

1    Q.    Is that the only one?
2    A.    Yes, sir.
3    Q.    Your son, Taveion, was not born yet,
4    right?
5    A.    I think he was, like, just forming.
6    Q.    Okay.  So she was pregnant?
7    A.    Yes.
8    Q.    All right.  So if you got called by
9    your mom to go downstairs at 4:45, what time do
10   you think Isis Walker came to your apartment?
11   A.    Like, right just before I was leaving.
12   Q.    Okay.  So sometime around 4:45?
13   A.    I'd say about ten minutes before that.
14   Q.    All right.  And then you and Isis
15   Walker both went downstairs together?
16   A.    Yes, sir.
17   Q.    How long did you wait downstairs for
18   your mom?
19   A.    It was really interrupted, I was only
20   waiting downstairs for, like, three minutes.
21   Q.    Okay.  And then is that when you saw
22   the police?
23   A.    Yes, that's when the police came.

---

34

1    Q.    All right.  When you were downstairs
2    with Isis Walker in front of 1365 North Hudson
3    waiting for your mom, was it dark outside?
4    A.    Yes.
5    Q.    Okay.  And you just said that you were
6    down there for about three minutes before you saw
7    the police?
8    A.    Yeah.
9    Q.    Other than you and Isis Walker, was
10   there anyone else around before the police got
11   there?
12   A.    Michael Jones.
13   Q.    Who's Michael Jones?
14   A.    A friend.
15   Q.    Do you know where he lives right now?
16   A.    No.
17   Q.    Do you know where Isis Walker lives
18   right now?
19   A.    I'm not sure of the address.
20   Q.    Okay.  Does she still live on Mohawk,
21   like you said?
22   A.    No, she lives on the west side of
23   Chicago.

---

35

1    Q.    She lives in the city?
2    A.    Yes.
3    Q.    And Michael Jones, you don't know
4    where he lives?
5    A.    No.
6    Q.    What I said is correct?
7    A.    Yes, sir.
8    Q.    Other than Isis Walker and Michael
9    Jones, was there anybody else downstairs where
10   you were waiting, at 1365 North Hudson, around
11   4:45 on the date of the incident?
12   A.    No, sir.
13   Q.    Tell me exactly where you were waiting
14   for your mom when you first saw the police.
15   A.    I was on the -- like, the left side of
16   1365 North Hudson.
17   Q.    Were you inside the building or
18   outside?
19   A.    Outside.
20   Q.    Were you on Hudson?
21   A.    Yes.
22   Q.    And then you were to the left of the
23   front door?

---

36

1    A.    Yes.
2    Q.    And the only people that you knew were
3    around were Michael Jones and Isis Walker?
4    A.    Yes, sir.
5    Q.    When did you first see the police on
6    this day?
7    A.    They came up Evergreen and then down,
8    came down Hudson.
9    Q.    You saw their car first?
10   A.    Yeah, I saw their car first.  They
11   came up, like, west of Evergreen, and then, like,
12   east of Hudson.
13   Q.    Okay.  Did they stop right in front of
14   the 1365 North Hudson building?
15   A.    Yes, sir.
16   Q.    Prior to seeing the police, did you
17   have any idea that anyone had called the police?
18   A.    No, but the only time that they would
19   come, if the guard having trouble with someone in
20   the complex building.
21   Q.    Okay.  Prior to seeing the police, did
22   you know -- did you know if anyone had been
23   fighting at the 1365 North Hudson building?

## 37

```
 1       A.   No.
 2       Q.   Prior to seeing the police, did you
 3  notice any kind of disturbance, yelling,
 4  screaming, or anything, going on in the lobby of
 5  the 1365 North Hudson building?
 6       A.   No.
 7       Q.   Did you have any knowledge that anyone
 8  in the building called the police on December 14,
 9  2005, before you saw them?
10       A.   No, sir.
11       Q.   Okay.  Can you describe the 1365 North
12  Hudson building for me?  Do you know how many
13  floors it has?
14       A.   Five floors.
15       Q.   Okay.  Do you know how many apartments
16  on each floor?
17       A.   It's three -- it's, like, some
18  buildings three on one floor, and some of them
19  two on one floor.
20       Q.   There are more than one building with
21  the address 1365 North Hudson?
22       A.   Yes.
23       Q.   Which building were you standing in
```

## 38

```
 1  front of on the day that you saw the police?
 2       A.   I was standing on the outside of the
 3  building.
 4       Q.   Right.  You were standing in front of
 5  a building though, right?
 6       A.   Yes.
 7       Q.   Okay.  Which building were you
 8  standing in front of?
 9       A.   I think it was 9A.
10       Q.   Okay.  So you walked from your
11  building, which was 6C --
12       A.   Yes.
13       Q.   -- to 9A, and then out in front of 9A?
14       A.   No, I walked from my building, 6C, to
15  the front of Marshall Field Garden, and that's
16  1365 North Hudson.
17       Q.   Okay.
18       A.   The building 9A is right before you
19  get to the security guard booth.
20       Q.   Okay.  So you mentioned to me that you
21  were standing to the left of a building at 1365
22  North Hudson?
23       A.   Yes.
```

## 39

```
 1       Q.   Do you know what building you were
 2  standing to the left of?
 3       A.   To my knowledge, it was 9A, but it was
 4  on the outside, not on the inside.
 5       Q.   Right.  You were standing out
 6  on the street, or at least on the sidewalk?
 7       A.   Yes.
 8       Q.   Okay.  Were you inside or outside the
 9  fence for Marshall Field Gardens?
10       A.   I was outside.
11       Q.   So you were on -- you weren't on
12  Marshall Field Gardens property, as far as you
13  knew?
14       A.   On the sidewalk of their property.
15       Q.   Okay.  I've got to -- I need to ask
16  some similar questions to what I've asked, now to
17  include all the buildings at 1365 North Hudson.
18       A.   Yes, sir.
19       Q.   Do you know if anybody, at any
20  building, prior to you seeing the police on
21  December 14, 2005, had called the police?
22       A.   Not to my knowledge.
23       Q.   Did you notice a disturbance or a
```

## 40

```
 1  fight, or anything other, at any of the buildings
 2  at 1365 North Hudson, before you saw the police
 3  on December 14, 2005?
 4       A.   To my best knowledge, it was, like a
 5  little noisy on the other end, 'cause there's,
 6  like, two ends.  It was a little noisy on the
 7  other end.  That's when I just kept going.  I
 8  never really tried to pay attention to what was
 9  going on.
10       Q.   Okay.  Aside from saying noise, it was
11  a little noisy, can you describe anything else
12  about what might have been going on over there?
13       A.   No.
14       Q.   As far as -- to your knowledge.
15       A.   Loud voices, just yelling.
16       Q.   You didn't -- did you see anyone
17  fighting?
18       A.   No.
19       Q.   Did you hear anyone yelling, call the
20  police?
21       A.   No.
22       Q.   Did you see any security guards at
23  1365 North Hudson at any time before you saw the
```

## 41

1 police?
2   A.   Yes.
3   Q.   Who did you see?
4   A.   I'm not sure of his name.
5   Q.   Okay.  When did you see the security
6 guard?
7   A.   When I was leaving out the front
8 entrance intersection of 1365 North Hudson.
9   Q.   When you were going out to meet your
10 mom?
11   A.   Yes.
12   Q.   Where did you see the security guard?
13   A.   In a security guard booth.
14   Q.   Okay.  Did you say anything to the
15 security guard?
16   A.   No, he was on the phone.
17   Q.   All right.  Did the security guard say
18 anything to you?
19   A.   No.
20   Q.   Do you know who he was calling?
21   A.   No.
22   Q.   Had you ever seen the security guard
23 before?

## 42

1   A.   Yes.
2   Q.   Had you ever spoken to this security
3 guard before, as far as you know?
4   A.   Probably like a, what's up, or
5 something like that.
6   Q.   Had you ever had any altercations with
7 the security guard?
8   A.   No.
9   Q.   Have you told me now about all the
10 interactions that you had with security before
11 the police came on December 14, 2005?
12   A.   Can you rephrase that?
13   Q.   Sure.  You told me that you saw the
14 security guard --
15   A.   Yes, sir.
16   Q.   -- before you saw the police?
17   A.   Yes, sir.
18   Q.   And he was in the booth?
19   A.   Yes, sir.
20   Q.   Have you now told me about all the
21 security guards that you saw before you saw the
22 police on December 14, 2005?
23   A.   There was one more security guard, he

## 43

1 was just on the computer.
2   Q.   Where was he?
3   A.   He was in the same area as the
4 security guard -- as the first security guard, in
5 the booth.
6   Q.   He was also in the booth?
7   A.   Yes.
8   Q.   And you saw him?
9   A.   Yes.
10   Q.   Did you talk to him?
11   A.   No.
12   Q.   Okay.  Do you know that security
13 guard's name?
14   A.   No, I'm not sure.
15   Q.   Okay.  Did you see any other security
16 guards before the police came, on that day?
17   A.   Just walking towards the other end of
18 the complex.
19   Q.   How many?
20   A.   Just one.
21   Q.   And this is a different guard than the
22 two who were in the booth?
23   A.   Yes, sir.

## 44

1   Q.   Do you know this guard's name?
2   A.   No, I don't know him at all.
3   Q.   Okay.  Did you have any conversations
4 with him?
5   A.   No.
6   Q.   So now we've talked about three
7 guards?
8   A.   Yes.
9   Q.   Did you see any others?
10   A.   No.
11   Q.   Do you know who the director of
12 security was at those buildings on the day of
13 this incident?
14   A.   The director's usually gone around,
15 like, 5:00, but I think his name is Thorn
16 something.  I don't know his last name.
17   Q.   Do you know if he still works at those
18 buildings?
19   A.   No.
20   Q.   No, he doesn't or --
21   A.   He doesn't.
22   Q.   Was Thorn one of the guards that you
23 saw before you saw the police on this day?

| 45 |
|---|

1    A.    No.
2    Q.    You said that he normally leaves at 5?
3    A.    No, he normally leaves around, like --
4 he'll be gone home around that time. He normally
5 leaves, like, after school time, like around
6 3:00.
7    Q.    Okay.
8    A.    He's the director of the buildings.
9 He like the overseer of the security guards.
10   Q.    Okay. How do you know he normally
11 leaves at 3 -- or let me rephrase that question.
12 Back on the date of this incident, how do you
13 know that he normally left at 3?
14   A.    That was his usual schedule. Like,
15 sometime I'll go down to the office with my
16 mother, and she'll just be talking about certain
17 things, or rent, or something like that.
18   Q.    Okay.
19   A.    And that's the time the office closes.
20   Q.    What time did the office close?
21   A.    Around 3:00.
22   Q.    Had you -- prior to this day, or on
23 this day, did you ever see Security Director

| 46 |
|---|

1 Thorn's schedule at the building?
2    A.    No, sir.
3    Q.    Did Security Director Thorn tell you,
4 at any point prior to this incident, I only work
5 until 3?
6    A.    No, sir.
7    Q.    Do you have any knowledge about
8 whether or not Security Director Thorn would ever
9 come back in the building after 3, prior to this
10 incident?
11   A.    No, sir.
12   Q.    Now, I'm going to move forward a
13 little bit. Well, actually, before I do that,
14 have you told me now about all the security
15 guards that you saw on the date of this incident?
16   A.    Yes, sir.
17   Q.    Prior to seeing the police?
18   A.    Yes, sir.
19   Q.    You mentioned that a police car came
20 up Evergreen and turned onto Hudson?
21   A.    Yes, sir.
22   Q.    And then stopped right in front of the
23 door.

| 47 |
|---|

1    A.    Yes, sir.
2    Q.    When you first saw that police car,
3 did you have any idea what they were doing there?
4    A.    No, sir.
5    Q.    And when you saw this police car, you
6 were with Michael Jones and Isis Walker?
7    A.    Yes, sir.
8    Q.    Anybody else?
9    A.    No, sir.
10   Q.    When those police officers got out of
11 their car -- I assume they got out of their car?
12   A.    Yes, sir.
13   Q.    Had you ever seen those police
14 officers before?
15   A.    The driver.
16   Q.    Okay. Where had you seen the driver
17 before?
18   A.    Just around our apartment building.
19   Q.    Had you ever been arrested by the
20 driver before?
21   A.    No, sir.
22   Q.    Had you ever been stopped by the
23 driver before?

| 48 |
|---|

1    A.    Yes.
2    Q.    Yes, okay. Do you know his name?
3    A.    I don't know his name.
4    Q.    Did you know his name back then and
5 you've just forgotten it, or you never knew it?
6    A.    I could say, I knew part of his name,
7 but I just forgot it.
8    Q.    You don't remember now?
9    A.    No.
10   Q.    Did he have a street name people
11 called him that you remember?
12   A.    Asshole.
13   Q.    Hey, man, all policemen have street
14 names, I know. So that's what people called him
15 on the street?
16   A.    Yeah.
17   Q.    Can you describe him for me?
18   A.    He's around, like, 140 pounds, like,
19 about 5 -- like, about 5'9", or a little bit
20 taller. He's -- he got brown eyes, got a like a
21 bald head but hair around the side, like around
22 this way.
23   Q.    So partially bald on top?

## 49

1  A.  Yeah, partially bald on top.
2  Q.  What else?
3  A.  That's basically it.
4  Q.  I'm sorry?
5  A.  I said that's basically it.
6  Q.  Okay.  On the day that you saw him,
7  December 14, 2005, do you remember what he was
8  wearing?
9  A.  A blue uniform.
10  Q.  Anything else that you remember?
11  A.  Black boots.
12  Q.  Anything else that you remember?
13  A.  He had on a dark blue shirt and, like,
14  a light blue shirt up underneath the dark blue
15  shirt.
16  Q.  So dark blue over light blue?
17  A.  Yes.
18  Q.  Did you ever see his star number?
19  A.  Yes.
20  Q.  What's his star number?
21  A.  I really don't know.  I can't
22  remember.
23  Q.  So you saw it, but you can't remember

## 50

1  it?
2  A.  Yes.
3  Q.  Anything else about that officer that
4  you can describe for me?
5  A.  No.
6  Q.  And there was a passenger in the
7  police vehicle?
8  A.  Yeah.
9  Q.  Had you ever seen that officer before?
10  A.  No, sir.
11  Q.  Okay.  Going back to the first guy for
12  a second, the driver.  You said you had been
13  stopped by him before.  Do you remember any of
14  the details of any of those stops?
15  A.  No, not really.
16  Q.  Had you ever been arrested by him
17  before?
18  A.  No.
19  Q.  The second guy now, the passenger, I
20  assume it was a male?
21  A.  Yes.
22  Q.  Can you describe him for me?
23  A.  Tall, like about 5'11", had like,

## 51

1  short length hair.
2  Q.  Short hair?
3  A.  Yeah.  Like a little bit more than
4  yours.
5  Q.  Okay.  Was he white or black?
6  A.  White.  Both of them were white.
7  Q.  Do you remember anything else about
8  that?
9  A.  He had on the same thing the first
10  officer had on, a blue -- dark blue shirt, and
11  navy blue shirt up under it.
12  Q.  So they were both in uniform?
13  A.  Yes.
14  Q.  All right.  Other than that, do you
15  remember anything else about the passenger?
16  A.  He had brown eyes.
17  Q.  Anything else?
18  A.  Like a little slim.
19  Q.  Okay.
20  MR. KSIAZEK:  I'm sorry?
21  THE WITNESS:  Like tall and a little
22  slim.
23  MR. KSIAZEK:  Oh, slim.

## 52

1  BY MR. GAINER:
2  Q.  Do you remember his name?
3  A.  No.
4  Q.  Do you remember his star number?
5  A.  No.
6  Q.  Anything else you remember about him?
7  A.  He had black boots, too.
8  Q.  All right.  When you first saw them
9  get out of the car, where did they go?
10  A.  They went into the entrance of 1365
11  North Hudson to the security booth.
12  Q.  Did they both go in?
13  A.  Yeah.
14  Q.  How far away from the security guard
15  booth were you standing when the officers went
16  there?
17  A.  How far away?
18  Q.  Yeah.
19  A.  Like when they were entering the
20  buildings?
21  Q.  No, when they got to the security
22  guard booth, how far were you from them?
23  A.  I'd say, like, 15 feet.

Case: 1:08-cv-06363 Document #: 86-1 Filed: 10/13/11 Page 14 of 45 PageID #:264

53

1    Q.    Did they talk to the security guards?
2    A.    I think so.  I didn't really pay
3    attention to what they was doing.  I was on this
4    side up here.
5    Q.    Could you hear any of the conversation
6    between the guard and the police officers?
7    A.    When the door was opening, I just
8    heard that -- the security say that they -- they
9    gone now, or whatever happened.
10   Q.    Who did you hear say that?
11   A.    The security guard.
12   Q.    Do you know which one?
13   A.    Not really.
14   Q.    And did you believe that he was saying
15   that to the police officers?
16   A.    Yes.
17   Q.    What made you think that?
18   A.    I don't know.  'Cause, like, the only
19   time the police comes is, like, when they have a
20   call or something like that.
21   Q.    Had you ever been stopped by the
22   police in or around the 1365 North Hudson
23   buildings?

54

1    A.    I'm sorry?
2    Q.    Prior to the date, December 14, 2005,
3    had you ever been stopped by the police, either
4    in or around the buildings at 1365 North Hudson?
5    A.    Yes, sir.
6    Q.    How many times do you think?
7    A.    I'm not really sure.  It's probably,
8    like, once or twice.
9    Q.    Okay.  Prior to December 14, 2005, had
10   you ever been arrested by the police in or around
11   the 1365 North Hudson building?
12   A.    No, sir.
13   Q.    Okay.  After you heard the security
14   officer say to the police, they're gone now, or
15   what you think you may have heard, do you know
16   what the police did next?
17   A.    I guess they was supposed to get back
18   in their car.  Before they approached, the driver
19   of the car told me to get the fuck out of there.
20   Q.    Okay.  Do you know if the police went
21   anywhere other than to the security booth before
22   they came back outside?
23         MR. KSIAZEK:  Calls for speculation.

55

1    Go ahead.
2    BY MR. GAINER:
3    Q.    Do you know -- I'm asking what you
4    know about whether they went anywhere.
5    A.    Before they got out of their car and
6    went to the booth?
7    Q.    After they talked to the guards in the
8    booth, do you know if they went anywhere else
9    before they came back outside?
10   A.    No, they got back into their car.
11   Q.    Okay.  And it was at that time the
12   driver said that to you?
13   A.    Before he got into the car, that's
14   when he told me to get the fuck out of there.
15   And I told him that I live here and I'm waiting
16   for my mother to bring groceries.
17   Q.    Okay.  Where was the officer standing
18   when he said that to you?
19   A.    Like, right in the middle of the -- of
20   the doorway.
21   Q.    So by the building still?
22   A.    Yes.
23   Q.    Okay.  And were you still standing to

56

1    the left of the building waiting for your mom?
2    A.    Yes, sir.
3    Q.    Other than what you testified the
4    policeman said to you, did he say anything else
5    at that time?
6    A.    No, sir.
7    Q.    Other than what you've told me you
8    said to him, did you say anything else at that
9    time?
10   A.    No, sir.
11   Q.    Did either of the people you were
12   with, Michael Jones or Isis Walker, say anything
13   to either of the officers at that time?
14   A.    No, sir.
15   Q.    Did they say anything to either
16   Michael Jones or Isis Walker at that time?
17   A.    No.
18   Q.    Did the passenger officer say anything
19   at that time?
20   A.    No, sir.
21   Q.    After you told the police officer that
22   you live there and you were waiting for your mom,
23   where did the police officers go?

| 57 | 59 |
|---|---|

**57**

1    A.    He got back into his car, he went down
2  Hudson towards, like, I'm going to say, like,
3  going -- like going -- like going east, then made
4  a U-turn and came back towards Hudson.
5    Q.    Okay.
6    A.    That's when he looked at me again, and
7  that's when he got out of the car and asked me my
8  name.
9    Q.    All right.  So they started driving
10  away from the building and then made a U-turn and
11  came back to the building?
12    A.    Yes.
13    Q.    Before we go any further about the
14  incident, prior to this date, how long had you
15  lived at 1365 North Hudson?
16    A.    For, like, at least eight, nine years.
17    Q.    Prior to the date you were arrested by
18  the police, you lived there eight or nine years?
19    A.    Like, that's -- can you rephrase that?
20    Q.    Sure.  Before December 14, 2005, how
21  long had you been living at 1365 North Hudson?
22    A.    For, like, at least eight or
23  nine years.

**59**

1  and came back?
2    A.    Yes, sir.
3    Q.    And then you said someone asked you
4  your name?
5    A.    That's when the driver asked me my
6  name.  He looked at me first and then he asked me
7  my name.
8    Q.    Okay.  Did he get out of his car to do
9  that?
10    A.    Yes.
11    Q.    Where did they stop the car the second
12  time?
13    A.    Right directly in front of the fire
14  hydrant, on the other side of the street, in,
15  like, the same spot they was the first time.
16    Q.    Okay.  So were they across the street
17  from you?
18    A.    Yes.
19    Q.    All right.  The driver got out of the
20  car?
21    A.    Yes.
22    Q.    Did he walk over to you?
23    A.    Yes, sir.

**58**

1    Q.    I just want to make sure we had the
2  time right.  In your experience living in that
3  building --
4    A.    Yes.
5    Q.    -- would you characterize that
6  building as an area where people sell narcotics?
7          MR. KSIAZEK:  Objection, calls for
8  speculation.  Go ahead.
9          THE WITNESS:  No.
10  BY MR. GAINER:
11    Q.    So you never seen anyone selling
12  narcotics out of those buildings?
13    A.    No.
14    Q.    Okay.  Prior to this incident, would
15  you have characterized that building, based on
16  your knowledge, as a violent place?
17    A.    No, sir.
18    Q.    All right.  Had there ever been any
19  shootings in those buildings prior -- that you
20  knew of, prior to this incident?
21    A.    No, sir.
22    Q.    Okay.  Now, let's move back forward.
23  You say the policemen drove away, did a u-turn,

**60**

1    Q.    All right.  Did the -- what did the
2  passenger do?
3    A.    The passenger, he had got out of the
4  car, too.
5    Q.    All right.  Did he also walk over to
6  you?
7    A.    Yes.  He didn't walk, like, close to
8  me.
9    Q.    How close was his partner to you when
10  he asked what your name was?
11    A.    His partner was the driver.
12    Q.    The driver?
13    A.    He was, like -- we was, like, face to
14  face.
15    Q.    All right.  Were you still with Isis
16  Walker and Michael Jones?
17    A.    Yes.
18    Q.    Was there anyone else with you at that
19  time?
20    A.    No, sir.
21    Q.    When the officer asked you your name,
22  what did you tell him?
23    A.    I told him my name was Terrence

## 61

```
 1   Barber.
 2        Q.   Did he say anything else after that?
 3        A.   He was, like, oh, you a Barber, and I
 4   was, like, yes.  Then after that, that's when he
 5   -- he started searching me.  He started searching
 6   my hat on my coat, like my hoodie, he started
 7   searching my hoodie.  I had nothing in my hoodie.
 8   That's when he went to my pockets, my front two
 9   pockets, searched my pockets.  I had probably,
10   like, about -- like about $75 in my pocket, some
11   keys, a phone, some Carmex.  That's when he threw
12   it all on the floor.  He asked me where did I get
13   the money.  I said my mother works, she gives me
14   allowance for cleaning up the house.
15        Q.   Keep going.  I don't want to cut you
16   off.  We're going to go back and cover all of
17   this.
18        A.   Okay.  So he threw it on the ground,
19   and I asked him what he was throwing my stuff on
20   the ground for.  He told me to shut the fuck up,
21   and fuck me, and all types of stuff like that.
22   So when he told me, fuck me, I said, fuck you.  I
23   replied back and said, fuck you.  Then he was,
```

## 62

```
 1   like -- he said other things like, your mother
 2   smokes crack, you ain't never going to be --
 3   stuff like that.
 4        Q.   All right.  Let me stop you there,
 5   because we've got a lot to cover now, and then
 6   we'll go forward from there in a minute.
 7        A.   Okay.
 8        Q.   First of all, the officer asked you if
 9   you were a Barber?
10        A.   Yes.
11        Q.   What did you think he meant by that?
12   What was your understanding of what he meant by
13   that?
14        A.   I don't know.
15        Q.   Do you have any knowledge that anyone
16   in your family had encountered this officer
17   before?
18        A.   No.
19        Q.   Okay.  And you told me that you'd
20   encountered this officer -- you had been stopped
21   by him one other time, right?
22        A.   Yes.
23        Q.   Was that before this happened?
```

## 63

```
 1        A.   Yeah.
 2        Q.   Okay.  When he came up and talked to
 3   you and asked you your name and started saying
 4   these things to you, did he tell you to -- did he
 5   put you on a car, or on a fence or anything?
 6        A.   No, not really.
 7        Q.   Okay.  So you guys were just facing
 8   each other?
 9        A.   Just facing each other, and he just
10   started searching me.
11        Q.   What about the other two people, what
12   were they doing, Isis and Michael?
13        A.   They was just standing right there,
14   that's when he told his partner to search my
15   friend, Michael.
16        Q.   What was Isis doing during this time?
17        A.   She was just standing there looking at
18   him.  And when he started saying the negative
19   stuff toward me, that's when he told her to get
20   the fuck out of there.
21        Q.   At any point during this encounter
22   that you were having with him, did he put you on
23   a car or a fence, or anything, or were you always
```

## 64

```
 1   speaking face-to-face?
 2        A.   No, he just -- we was speaking
 3   face-to-face, then after he throwed my stuff on
 4   the ground, he told me to get on the wall and
 5   stuff like that.
 6        Q.   All right.  You mentioned that after
 7   -- that he asked you if you were a Barber?
 8        A.   Uh-huh.
 9        Q.   He started going through your pockets?
10        A.   Yes, sir.
11        Q.   He went through your coat pockets
12   first?
13        A.   Yes, sir.
14        Q.   Was there anything in your coat
15   pockets?
16        A.   No, I had on a black hoodie.  There
17   wasn't nothing in my pockets.
18        Q.   I see.  So he went through your hoodie
19   pocket?
20        A.   Yes, sir.
21        Q.   And this -- you were still standing
22   face-to-face?
23        A.   Yes, sir.
```

Terrence Barbee                                                          January , 2010

## 65

1    Q.    By this point, was his partner
2   searching Michael Jones?
3    A.    Yes.  He told my friend to get on the
4   wall.
5    Q.    But you were still face-to-face?
6    A.    Yes.
7    Q.    All right.  And that's when he said,
8   fuck you?
9    A.    Yeah.
10    Q.    And then you said, fuck you, back to
11   him?
12    A.    Yeah.
13    Q.    And then he started going through your
14   pants pockets?
15    A.    Yeah.  When he -- when -- I had asked
16   him, like, before he was searching me, I was,
17   like, what you searching me for.  That's when he
18   told me to shut the fuck up and stuff like that.
19    Q.    All right.  And then you mentioned he
20   threw all your stuff in the ground?
21    A.    Yeah, in the snow.
22    Q.    In the snow?
23    A.    Yeah, to the right side.

## 66

1    Q.    Did you have ID on you at that point?
2    A.    No.
3    Q.    You said you had Carmex --
4    A.    Keys.
5    Q.    -- keys --
6    A.    Phone.
7    Q.    -- cell phone --
8    A.    And, like, $75.
9    Q.    -- and, like, 75 bucks.  And he threw
10   it all in the snow?
11    A.    Yes.
12    Q.    Including the money?
13    A.    Including the money.
14    Q.    All right.  Could you hear any
15   conversations going on between the driver's
16   partner and Michael Jones?
17    A.    No.
18    Q.    You mentioned then that after he threw
19   your stuff on the ground, you started arguing
20   again -- or you started talking to him and he was
21   talking to you again?
22    A.    Yeah.  I asked him, like, what was he
23   searching me for.

## 67

1    Q.    What did he say?
2    A.    He just told me to shut the fuck up.
3   So I told him that I live there and I was waiting
4   for my mother.  He just told me to shut the fuck
5   up and stuff like that.
6    Q.    All right.  And that's when he said
7   that your mom smokes crack?
8    A.    Yeah.  He called me a bitch, and
9   that's when I called him one.  And then he just
10   started saying all kinds of racial comments and
11   stuff like that.
12    Q.    So he called you a bitch?
13    A.    Yeah.
14    Q.    And you called him a bitch back?
15    A.    Yeah.
16    Q.    Then he made racial comments?
17    A.    Yeah.
18    Q.    What kind of racial comments?
19    A.    Like, you're a black mother fucker,
20   you ain't never going to be nothing, and stuff
21   like that.
22    Q.    And this whole time, we're talking
23   about what, the driver?

## 68

1    A.    Yes.
2    Q.    During this whole time did you ever
3   have a conversation with the passenger?
4    A.    No, sir.
5    Q.    All right.  Other than the verb -- you
6   guys were obviously having a verbal altercation?
7    A.    Yes.
8    Q.    Did it ever become physical while you
9   were out on the street?
10    A.    No, sir.
11    Q.    Did he ever put his hands on you while
12   you were out on the street?
13    A.    It was, like, he kind of got a little
14   aggressive after I called him a bitch back and
15   stuff like that, after -- I was replying to him,
16   'cause I was really got a little aggressive, and
17   these comments towards me for, I ain't never did
18   nothing to you, and stuff like that.  So that's
19   when he really got a little aggressive, and
20   that's when he, I guess, just handcuffed me.
21    Q.    Explain to me what you mean by
22   aggressive.
23    A.    Like, grab my shirt and, just shut the

| | 69 | | 71 |
|---|---|---|---|

**69**

1  fuck up, and stuff like that. He grabbed my arm
2  and then put it behind my back.
3      Q.    Okay. The entire time you guys were
4  arguing, were you always face-to-face?
5      A.    Yes.
6      Q.    All right. When he handcuffed you --
7  when he started to handcuff you, were you still
8  face-to-face?
9      A.    He, like, turned me around, like spin
10  me around a little bit.
11      Q.    Okay. And then he cuffed you?
12      A.    Yes.
13      Q.    Other than grabbing your shirt, what
14  else did he do -- other than handcuffing you, to
15  be aggressive, what else?
16      A.    That's it.
17      Q.    That's it. Okay. Did you suffer any
18  injuries when he grabbed your shirt?
19      A.    No, sir.
20      Q.    Did you suffer any injuries when he
21  handcuffed you?
22      A.    No, sir.
23      Q.    All right.

**71**

1  what did he do?
2      A.    He told his partner -- he told his
3  partner to finish searching my -- he told his
4  partner to finish searching my friend, and that's
5  when his partner handcuffed my friend, too.
6      Q.    Okay.
7      A.    Then my friend kept asking, what the
8  fuck we do, why we going in, stuff like that. So
9  they just like, shut up, man. So that's when
10  they started putting us in the car.
11      Q.    They put you both in the same police
12  car?
13      A.    Yes, sir.
14      Q.    All right. Up to the point where
15  you're placed in the police car, did you have any
16  conversations with the passenger officer?
17      A.    No, sir.
18      Q.    Other than hearing Michael Jones
19  saying, why are we going in, what's going on,
20  what you've already told me, did you hear any
21  conversations he had with either of the officers
22  up and to the point where you got placed in the
23  police car?

**70**

1      A.    He just had the cuffs a little too
2  tight.
3      Q.    Other than what you've already told me
4  that you guys said to each other, at this point
5  did you say anything else to each other?
6      A.    I didn't say nothing else, I just
7  asked him, like, why you locking me up, I'm
8  waiting here for my mom, that's it. I told him I
9  lived there. That's it.
10      Q.    Okay. Other than what you told me he
11  said to you out on the street, did he say
12  anything else to you?
13      A.    No. He told me, like -- when we got
14  into the car he told me, I should have put some
15  drugs on you.
16      Q.    Okay. I'm going to get to the car in
17  a minute. I just want to know about out on the
18  street.
19      A.    Okay.
20      Q.    Have you told me everything that he
21  said to you out on the street?
22      A.    Yes.
23      Q.    All right. After he handcuffed you,

**72**

1      A.    No, sir.
2      Q.    What time do you think -- strike that.
3          How long do you think this encounter
4  with the police on the street lasted?
5      A.    I'd say at least about five minutes.
6  All right.
7      Q.    Did Isis go back in the building?
8      A.    She just walked off towards Evergreen.
9      Q.    Okay. And that was after they told
10  her to get lost?
11      A.    Yes.
12      Q.    Did anybody in the building, anybody,
13  security guards, people who live there, anybody,
14  to your knowledge, ever accuse you of creating a
15  disturbance at the building before the police
16  came?
17      A.    No, sir.
18      Q.    How about Michael Jones, do you know
19  if anybody accused Michael Jones of creating a
20  disturbance in the building before the police
21  came?
22      A.    No, sir.
23      Q.    So you never heard that about either

Case: 1:08-cv-06363 Document #: 86-1 Filed: 10/13/11 Page 19 of 45 PageID #:269

## 73

1    of you?
2        A.    No.  If it was a disturbance, the
3    security guard would have come out and told us,
4    you being too loud, you need to move, he never
5    told us anything.
6        Q.    Do you know a security -- or did you
7    know a security guard there named Washington?
8        A.    Yes.
9        Q.    Was he there that night?
10       A.    Yes.
11       Q.    Where was he that night?
12       A.    In the security guard booth.
13       Q.    Did you have any conversations with
14   him that night?
15       A.    No, sir.
16       Q.    Did you ever see Thorn, at any point,
17   when you were there that night?
18       A.    No, sir.
19       Q.    All right.  Did you see anybody
20   standing in front of the buildings blocking the
21   entrance, not letting people inside?
22       A.    No, sir, the door was clear.
23       Q.    Okay.  Did you ever see anybody in or

## 74

1    around the front of the building yelling out
2    obscenities?
3        A.    No, sir.
4        Q.    Did you ever see anyone fighting on
5    the ground before you saw the police?
6        A.    No, sir.
7        Q.    I know you -- I'm sure, maybe you're
8    not, are you familiar with the idea that a lot of
9    CHA buildings are particular gang territories,
10   owned by particular gangs?
11       A.    I'm not sure.
12       Q.    You never heard that before?
13       A.    No.
14       Q.    Did you have any knowledge about
15   whether or not any of those Marshall Field
16   buildings were owned by any particular gang?
17       A.    No.
18       Q.    When you were placed in the police car
19   handcuffed, did anybody tell you what you were
20   being arrested for?
21       A.    No.
22       Q.    When you were being placed in the
23   police car, did you struggle so they couldn't

## 75

1    place you in there?
2        A.    No, sir, I just got in.
3        Q.    All right.  Once you got placed in the
4    police car, where did you go?
5        A.    To the 18th District.
6        Q.    Where's the 18th District?
7        A.    On Division.
8        Q.    So the new 18th District?
9        A.    Yes.
10       Q.    Back then it would have been almost
11   brand new, right?
12       A.    Yes.
13       Q.    Had you ever been in that building
14   before?
15       A.    No, sir.
16       Q.    Were you handcuffed behind your back?
17       A.    Yes, sir.
18       Q.    Was Michael Jones handcuffed behind
19   his back?
20       A.    Yes, sir.
21       Q.    How long did it take you to get from
22   the building to the station?
23       A.    Like, about, three minutes.

## 76

1        Q.    Do you know what time it was when you
2    were taken to the station?
3        A.    It was, like, about 5:10.
4        Q.    Say that one more time.
5        A.    I think around, like, 5:10.
6        Q.    5:10 p.m.?
7        A.    Yeah.
8        Q.    And you think the encounter on the
9    street with the police lasted about five minutes,
10   you said?
11       A.    Yes.
12       Q.    All right.  Do you know what happened
13   to the stuff that was thrown into the snow, your
14   stuff?
15       A.    They just picked it back up and put it
16   back into my pocket.
17       Q.    So the officers put it back in your
18   hoodie before he took you away?
19       A.    Yes.
20       Q.    Did he put everything back in your
21   hoodie?
22       A.    Yes.
23       Q.    Including the money?

## 77

1    A.    Yes.

2    Q.    While you were riding to the police

3  station in the police car, did you have any

4  conversations with either of the police officers?

5    A.    No, I just kept asking them why was I

6  going in.  He never said nothing, he just said,

7  shut the fuck up.

8    Q.    Anything else that either of the

9  police said to you while you're in the car on the

10 way to the police station?

11   A.    No.  He just told me that he should

12 have put some drugs on me.

13   Q.    Okay.  Anything other than that?

14   A.    No.

15   Q.    Did he ever put drugs on you?

16   A.    No.

17   Q.    Did you ever hear Michael Jones saying

18 anything to either of the police officers on your

19 way to the station?

20   A.    No, he was just asking them, like,

21 what the fuck we do.

22   Q.    Did you hear any of the officers say

23 anything back to him?

## 78

1    A.    No, he didn't say nothing.

2    Q.    When you got to the police station,

3  who took you out of the car?

4    A.    The driver.

5    Q.    Who took Michael Jones out of the car?

6    A.    The passenger.

7    Q.    Where did they park the car, do you

8  remember?

9    A.    In the garage of the 18th District.

10   Q.    All right.  Where did you -- once you

11 were taken out of the car where did you go?

12   A.    I was taken out of the car, there's

13 like a little door -- a little processing door

14 that they go through before you go all the way

15 into the 18th District.

16   Q.    All right.

17   A.    There's like a little brick -- I'd say

18 it's about four inches high -- four or five

19 inches high.  He pulled down my hoodie, told me

20 to get the fuck out.  I tripped over the brick,

21 that's when he drug me all the way -- he

22 processed -- he entered his -- whatever, pin

23 number or whatever, into the door code, the door

## 79

1  opened, and he did it to another door, the door

2  opened again.  That's when he drug me by my

3  hoodie.  He drug me all the way to a holding

4  cell, stood me up a little bit, and pushed me in

5  the back, my upper back, causing me to fall.

6    Q.    Okay.  Let's start with the first door

7  going in.  The driver is bringing you inside?

8    A.    Yes, dragging me.

9    Q.    Okay.  It sounded to me like you said

10 that you had to go through two doors before you

11 were dragged?

12   A.    Yes, sir.

13   Q.    Is that right?

14   A.    Yes.

15   Q.    So let's talk about the first door you

16 went through.  When you went into the first door

17 into the building, were you still standing up?

18   A.    No.

19   Q.    Okay.  Did you fall down outside?

20   A.    I fell down over the brick -- there's

21 like a brick stump about five inches high, that

22 you've got to step over.  He was pulling me by my

23 -- by my thing, so I really never -- never caught

## 80

1  my balance after -- he just snatched me out of

2  the car by my hoodie.

3    Q.    All right.  The brick thing that you

4  tripped over, was that inside or outside the

5  building?

6    A.    That was inside the garage.

7    Q.    Okay.  So inside the garage but not

8  yet in the building?

9    A.    Not yet in the building, yes, sir.

10   Q.    All right.  Which officer was it that

11 pulled you out by your hoodie?

12   A.    The driver.

13   Q.    And he's the one that took you to the

14 first door?

15   A.    Yes, sir.

16   Q.    And my understanding from what you're

17 saying is, you fell down before you went through

18 the first door?

19   A.    Yes, sir.

20   Q.    And is the first door, the door that

21 he had to enter his code into?

22   A.    Yes, sir.

23   Q.    Okay.  What was the passenger officer

---

81

1   doing at this point?
2       A.   He was just standing behind with -- he
3   was holding my friend, Michael.
4       Q.   All right.  Was there anyone else
5   around when you fell, other than the two officers
6   and Michael?
7       A.   No.
8       Q.   Do you know if Michael saw you fall?
9       A.   Yes.
10      Q.   Do you know if the passenger officer
11  saw you fall?
12      A.   Yes.
13      Q.   Did you hear any of them say anything
14  when you fell?
15      A.   No.
16      Q.   You went through the first door --
17  strike that.
18           He dragged you through the first door?
19      A.   Yes.
20      Q.   By your hood?
21      A.   Yes.
22      Q.   And then it sounds like you went to a
23  second door?

---

82

1       A.   Yes, sir.
2       Q.   How far do you think the second door
3   was from the first door?
4       A.   Probably about two or three inches
5   away.
6       Q.   Did he have to enter a code to get in
7   the second door?
8       A.   Yes.
9       Q.   Okay.  And then he took you through
10  the second door?
11      A.   His partner went in first.  His
12  partner entered his code.  His partner went in
13  first and entered his code, he took my friend to
14  the holding cell, that's when he drug me to the
15  other -- to the second cell.  We was in separate
16  cells.
17      Q.   Okay.  So were you dragged through the
18  second door?
19      A.   Yes, sir.
20      Q.   Still by your hoodie?
21      A.   Still by my hoodie.
22      Q.   Up until that point, when you were
23  dragged through the second door, had you suffered

---

83

1   any injuries?
2       A.   Just little scrapes on my back.
3       Q.   You hadn't cut yourself?
4       A.   No.
5       Q.   When you were dragged to the second
6   holding cell, were you the only person in that
7   cell?
8       A.   Yes, sir.
9       Q.   All right.  Did Michael Jones, to your
10  knowledge, see you dragged to the second holding
11  cell?
12      A.   Yes, sir.
13      Q.   What about the passenger officer?
14      A.   Yes, sir.
15      Q.   But it's the driver who was still
16  dragging you?
17      A.   Yes, sir.
18      Q.   All right.  And then were you taken
19  into the second holding cell?
20      A.   Yes, sir.
21      Q.   At any point, from the time that you
22  first fell, to the time you went into the second
23  holding cell, did you ever get back up?

---

84

1       A.   No, I was still handcuffed.
2       Q.   Did you ever get back on your feet?
3       A.   No, sir.
4       Q.   Okay.  And then I think you mentioned
5   that when you got into the second holding cell,
6   he stood you up?
7       A.   He stood me up a little bit, but
8   that's when he pushed me into the cell.
9       Q.   All right.  And this is still the
10  driver?
11      A.   Yes, sir.
12      Q.   All right.  And you're still
13  handcuffed behind your back?
14      A.   Still handcuffed.
15      Q.   How much time elapsed, do you think,
16  from the time you were taken from the car until
17  the time you were placed in the second holding
18  cell?
19      A.   How much time do I think it was?
20      Q.   Yeah.
21      A.   I'd say, at least about 30 seconds.
22      Q.   All right.  So then the officer tried
23  to get you back upright?

## 85

1    A.    Yeah, he had me by my hoodie.
2    Q.    Okay.  By your hoodie.  So he picked
3  you up by your hoodie?
4    A.    Yes.
5    Q.    And then you said -- did you get back
6  up on your feet at that point?
7    A.    Not really.
8    Q.    All right.  So you were at least
9  somewhat upright?
10    A.    Yeah.
11    Q.    And then he pushed you?
12    A.    Pushed me.
13    Q.    On what part of your body did he push
14  you?
15    A.    My upper back.
16    Q.    And you were obviously facing the
17  other direction?
18    A.    Yes, into the holding cell.
19    Q.    Right.  So you couldn't see him when
20  he pushed you, but you felt his hands?
21    A.    Yes, sir.
22    Q.    When he pushed you what happened?
23    A.    That's when I fell onto the brick and

## 86

1  hit my face.
2    Q.    Tell me exactly what kind of
3  instrument or thing you struck your face on.
4    A.    Like a brick layer coming out of the
5  wall.  Like a thick layer of brick.
6    Q.    Okay.  Do you have any idea what it
7  was, what it was called?
8    A.    Not really.
9    Q.    All right.  Do you have any idea what
10  it was for?
11    A.    Just to sit down.
12    Q.    Okay.  Did you hit a bench?
13    A.    Yeah, it's like a bench, but it's made
14  out of brick.
15    Q.    I see.  So it's a bench made out of
16  brick inside the holding cell?
17    A.    Yes.
18    Q.    All right.  Had you ever been in that
19  holding cell before?
20    A.    No, sir.
21    Q.    What part of your head hit the bench?
22    A.    The right side -- wait, the left side.
23  Right side.

## 87

1    Q.    So -- just so it's on the record, you
2  just took your hand and you rubbed your right
3  eyebrow?
4    A.    Yes, sir.
5    Q.    So was it your right eyebrow that
6  first hit the bench?
7    A.    Yes, sir.
8    Q.    Okay.  Did any other part of your body
9  hit the bench at that time?
10    A.    Just the bottom of my face.
11    Q.    Okay.  So for the record again, the
12  other part of your face, you're saying, that hit
13  the bench, aside from your right eyebrow, is your
14  -- underneath your right eye, like your cheek?
15    A.    Yes, sir.
16    Q.    Any other part of your body hit the
17  bench, other than your right eyebrow, and then
18  underneath your right eye?
19    A.    No.
20    Q.    All right.  Did any other part of your
21  body get injured at that point, other than your
22  right eyebrow and underneath your right eye?
23    A.    No, sir.

## 88

1    Q.    All right.  Tell me what happened
2  immediately after your face hit that bench.
3    A.    He just walked away, and that's when
4  I'm still laying on the floor.  And that's when I
5  felt my -- that's when I felt blood come from my
6  face and going into my eye.  And that's when I
7  seen another lady officer, with long blond hair,
8  like a little -- she was a little short, like
9  5'7, white, she had, like, blue eyes.  She looked
10  at me, she shook her head.  Then that's when -- I
11  guess she must have went back.  She offered me to
12  go to the bathroom to get some napkins for my
13  face, to cover it up.  And that's when they
14  called a janitor to come and clean up the blood,
15  and that's when the officers came back in there.
16  I guess after she went to go tell them what
17  happened, that's when they came back in there and
18  tried to take me to the hospital.  I told them I
19  really don't want to go to the hospital, I just
20  want to go home.
21    Q.    So after your face struck the bench,
22  did you fall down to the ground?
23    A.    Yes.

89

1    Q.    And you noticed that you were
2  bleeding?
3    A.    Yes.
4    Q.    And the two arresting officers were
5  not there?
6    A.    They were not there, they just walked
7  off.
8    Q.    And you saw a female blond officer?
9    A.    Yes.
10    Q.    At what point did you see her?  How
11  long were you on the ground before you first saw
12  her?
13    A.    I'd say I was laying there for, like
14  -- I blanked out a little bit.  I can't really
15  tell you the amount of time that it was after I
16  blanked out.  I just -- when I woke up again, I
17  just seen her.  This side of my eye was covered
18  with blood.  I just seen her out of my -- the
19  left side of my eye.
20    Q.    What do you mean when you say you
21  blank out?  What does that mean?
22    A.    Like, it just went black for, like,
23  about a couple minutes or seconds.  I really

90

1  don't know the time.
2    Q.    Okay.  Did you lose complete
3  consciousness?
4    A.    Yes.
5    Q.    All right.  So when you woke up, tell
6  me, how was your body positioned?
7    A.    I was still like -- like -- I was like
8  this.  I can't --
9    Q.    Here, maybe I can make it a little
10  easier.  Were you on your hands and knees?
11    A.    I was on my chest, on the front of my
12  body.
13    Q.    So you were laying on your chest?
14    A.    Yes.
15    Q.    Were your legs flat on the ground,
16  too?
17    A.    Yes.
18    Q.    And that's the way you were positioned
19  when you woke up?
20    A.    Yes, and then that's when I rolled
21  over onto my buttocks.
22    Q.    Okay.  How long do you think you
23  blanked out?

91

1    A.    I'm not sure.
2    Q.    All right.  And then when you woke up,
3  you said through your left you saw this female
4  officer?
5    A.    Yes, sir.
6    Q.    Do you have any idea what her name
7  was?
8    A.    No, sir.
9    Q.    Do you have any idea what her star
10  number was?
11    A.    No, sir.
12    Q.    Was she wearing a police uniform?
13    A.    Yes, sir.
14    Q.    Did she say anything to you other than
15  telling you that she was going to take you to the
16  bathroom to get your cut cleaned up?
17    A.    No, sir.
18    Q.    Did you say anything to her?
19    A.    No, sir.
20    Q.    Did you see anyone else around, other
21  than her, after you were injured, in the lockup?
22    A.    No, sir.  After I walked out the cell,
23  I looked at my friend, and he just shook his

92

1  head.  His eyes got big.  He just shook his head.
2  I didn't really know that I had that much damage
3  on my head until I went to the bathroom.
4    Q.    Where was your friend?
5    A.    He was in the first holding cell.
6    Q.    Based on the fact that he was in the
7  first holding cell and this happened in the
8  second, he couldn't see that you fell and hit
9  your head, could he?
10    A.    No.
11    Q.    He saw your injury after it happened?
12    A.    Yes.
13    Q.    Would you agree, based on what you
14  know, he didn't see when you hit your head on the
15  bench?
16    A.    No, like -- it's like -- when the
17  officer was pushing me, that's when they were
18  walking him past to the first holding cell.
19    Q.    Okay.  You first mentioned -- when you
20  first testified, back, like, five minutes ago,
21  you said that when you came through the second
22  door, the passenger officer took Jones in first
23  and put him in the first holding cell, and then

## 93

1  the driver officer took you into the second one.
2      A.   Yes.
3      Q.   And now it sounds like you're saying
4  that you went into a cell first, and then Jones
5  went in.  So I'm a little confused.
6      A.   It's like -- the cell is like, one
7  cell's right here, and one cell's right here.  I
8  stopped at this door.  The officer stopped at
9  this door.  And there's, like, about two or three
10  inches, and this is, like, the other cell.  And
11  that's when I went into this cell, and he went
12  that cell.
13      Q.   Okay.  So now you're saying you went
14  into the first holding cell?
15      A.   I didn't go in yet.  It was, like, I
16  was standing at the front door, and he was
17  standing at the other side.  That's when he was
18  letting me walk past to the second cell.
19      Q.   Do you have any knowledge that Michael
20  Jones saw you get pushed and hit your head?
21      A.   I'm not really sure.
22      Q.   Have you talked to him about this?
23      A.   Yeah, I talked to him.

## 94

1      Q.   Did he say he saw you get pushed and
2  hit your head?
3      A.   No, he was just like, man, that's
4  fucked up what they did.
5      Q.   Right.  So he saw the fact that you
6  had a cut on your face?
7      A.   Yes, sir.
8      Q.   But as far as you know, he did not see
9  you hit your head?
10      A.   Not to my knowledge.
11      Q.   All right.  Do you have any knowledge
12  about whether the passenger officer saw you get
13  pushed and hit your head?
14      A.   Not to my knowledge.
15      Q.   Do you have any knowledge that anyone
16  other than you and the police officer who was in
17  the cell with you, saw you fall and hit your
18  head?
19      A.   Can you rephrase that?
20      Q.   Do you know of anyone, anyone at all,
21  other than you and the driver officer that was
22  there when you hit your head, and saw you hit
23  your head on the bench?

## 95

1      A.   No.
2      Q.   All right.  So this female officer
3  took you to the bathroom?
4      A.   Yes.
5      Q.   Was there a mirror in the bathroom?
6      A.   It's like -- it's like, the dryer,
7  it's like silver, that's when I really looked
8  into it.
9      Q.   What did you see when you looked?
10      A.   I just seen, like, my eye split, seen
11  my face scraped up.
12      Q.   Okay.  And you just -- for the record,
13  you were pointing to your right eyebrow and
14  underneath your right eye?
15      A.   Yes.
16      Q.   Were you still bleeding when you were
17  in there?
18      A.   It was, like, a little bleeding, but
19  it wasn't bleeding as bad as it was at first.
20      Q.   Okay.  Were you able to try and clean
21  yourself up in there?
22      A.   Not that much.  I just got a couple
23  little napkins.  She gave me a couple napkins.  I

## 96

1  wet it a little bit, put it over my eye and I
2  went back to the cell.  That's when -- it was
3  bleeding a little bit more, that's when they came
4  back and took me to the hospital.
5      Q.   When you were pushed down and hit your
6  face, were you still handcuffed?
7      A.   Yes, sir.
8      Q.   When were you unhandcuffed?
9      A.   When they came back.  When she took me
10  to the bathroom to clean up my face.
11      Q.   Who unhandcuffed you?
12      A.   The lady officer.
13      Q.   All right.  She did that before you
14  got to the bathroom?
15      A.   Yes.
16      Q.   How long do you think you were in the
17  bathroom?
18      A.   Just for, like, about -- I took a
19  urine, and I just looked at it, that's when I
20  came back out.  I'm going to say, like, about
21  five seconds.
22      Q.   Was she waiting for you outside, the
23  female officer?

97

1      A.     Yes, sir.
2      Q.     Where did she take you then?
3      A.     She took me back to the holding cell.
4      Q.     Had it been cleaned up?
5      A.     The janitor was just coming in.  He
6  was, like, mopping it up a little bit.
7      Q.     All right.  So they put you back in
8  the same holding cell you were in when you hit
9  your face?
10     A.     Yes, sir.
11     Q.     At some point, did the other officers
12  -- did the officers who arrested you come back?
13     A.     Yes, sir.  After she left.  She
14  handcuffed one arm to the -- to the -- it was,
15  like, a little post.  She handcuffed one arm to
16  the to post.  Then that's when they -- she walked
17  off, and, like, a couple seconds later, that's
18  when the driver and the passenger came back.
19     Q.     Did you overhear any conversations
20  between this blond female officer and the
21  arresting officers?
22     A.     No.
23     Q.     Do you have any idea what they talked

98

1  about?
2      A.     No.
3      Q.     Other than this blond female officer
4  and the arresting officers, did you encounter any
5  other police officers that night?
6      A.     No.
7      Q.     How long was it before they came back,
8  the two arresting officers?
9      A.     Just a couple seconds later.
10     Q.     All right.  When they came back what
11  happened?
12     A.     They said, we got to get you to a
13  hospital.
14     Q.     Which one said that?
15     A.     The driver said it.
16     Q.     He said that to you?
17     A.     Yes.
18     Q.     Did he say anything else at that
19  point?
20     A.     No.
21     Q.     And then you testified that you told
22  them you didn't want to go?
23     A.     I told them I didn't want to go, I

99

1  wanted to go home.  I wasn't supposed to be here
2  anyway.
3      Q.     Right.  And what did he say in
4  response to that?
5      A.     He said, you have to go to the
6  hospital.
7      Q.     Did you hear them saying anything to
8  Jones at this point?
9      A.     No.
10     Q.     Okay.  After they told you, you're
11  going to the hospital, what happened next?
12     A.     They just took me to the hospital.
13     Q.     All right.  Were you still bleeding at
14  this point?
15     A.     A little slight, but not that much.
16     Q.     Were you holding anything -- were you
17  able to hold anything to your eye or anything?
18     A.     Yes, with my one hand.
19     Q.     All right.  What were you holding to
20  your eye?
21     A.     Paper towels, brown paper towels.
22     Q.     All right.  Did they -- did the
23  officers then immediately uncuff you and take you

100

1  to the hospital?
2      A.     Yes.
3      Q.     When I say uncuff you, I mean uncuff
4  you from the wall.
5      A.     Yes.
6      Q.     Did they rehandcuff you behind your
7  back?
8      A.     No.
9      Q.     All right.  Up until this point, when
10  the officers tell you you've got to go, and they
11  start taking you, do you have any idea whether or
12  not they had done any paperwork for you?
13     A.     I'm not sure.
14     Q.     Had they asked you any questions?
15     A.     No.
16     Q.     Other than the time you told me when
17  you told the driver officer your name, when you
18  were still out on the street, up until this point
19  had you told them your name again?
20     A.     Yeah, he asked me my name.  He just
21  looked it up in the computer.
22     Q.     When was this?
23     A.     While I was in the car.

## 101

1    Q.    When you were in the car before you
2  got to the police station?
3    A.    Yes.
4    Q.    Other than asking you your name at
5  that point, did he ask you anything else?
6    A.    No.
7    Q.    Did he ever ask you your birth date?
8    A.    Yeah, he asked me my birthday.
9    Q.    When was that?
10   A.    When we was in the car.
11   Q.    Before the police station?
12   A.    Yes.
13   Q.    What did you tell him your birthday
14 was?
15   A.    I told him my birthday was 2/14/91.
16   Q.    All right.  Did he ask you how old you
17 were?
18   A.    Yes.
19   Q.    What did you tell him?
20   A.    I was 16.
21   Q.    Did he ask you anything else?
22   A.    No.
23   Q.    There was a computer in the police

## 102

1  car?
2    A.    Yes.
3    Q.    Did you see him putting your
4  information into the computer?
5    A.    First he put my friend's information
6  in there, then mine.
7    Q.    Okay.  Is this before you left the
8  1365 North Hudson building, or is this --
9    A.    No, this is during the time we was
10 leaving, going to the police station.
11   Q.    Okay.  So this is while you were
12 driving?
13   A.    Yes.
14   Q.    All right.  When he put your name in,
15 did you see what it said in there, on the
16 computer, when your information came up?
17   A.    No.
18   Q.    Okay.  Did you have any conversations
19 with either of the officers about what the
20 computer was saying about you?
21   A.    No, I didn't have no record, so it
22 really didn't matter to me.
23   Q.    Okay.  So you didn't know, and you

## 103

1  didn't care, because you knew you didn't have a
2  record?
3    A.    Yes.
4    Q.    Have you ever been arrested as a
5  juvenile?
6    A.    I can't remember.
7    Q.    Okay.  So then the officers, did they
8  put you back in the same squad car to take you to
9  the hospital?
10   A.    Yes.
11   Q.    Was it the same deal, the same guy was
12 driving, the same guy was the passenger?
13   A.    Yes.
14   Q.    What hospital did they take you to?
15   A.    I think, to my best knowledge, I think
16 it was Lincoln Park Hospital.
17   Q.    Okay.  Do you have any idea what time
18 you got to Lincoln Park Hospital?
19   A.    No.
20   Q.    All right.  Do you have any idea how
21 long you stayed at Lincoln Park Hospital?
22   A.    For, like, about a half hour.
23   Q.    All right.  Do you know the names of

## 104

1  any of the doctors or nurses you talked to at
2  Lincoln Park Hospital?
3    A.    No.
4    Q.    When you got to Lincoln Park Hospital,
5  where did you first go?
6    A.    I went to the emergency room.
7    Q.    Was the first medical provider you
8  talked to a nurse, or a doctor, or something
9  else?
10   A.    A doctor.
11   Q.    And you don't remember his name?
12   A.    No, it was a lady.
13   Q.    Do you remember her name?
14   A.    No.
15   Q.    Do you remember the conversation you
16 had with her?
17   A.    She asked me, like, what happened, and
18 as I was telling her what happened, officer --
19 the driver said, oh, he just fell, and then
20 that's when he told her to come here or whatever,
21 however he did it.
22   Q.    Told her to what?
23   A.    He told her to, like, come here, then

| 105 | 107 |
|---|---|
| 1  they just walked up for a little while. And then | 1  Q. Was it the same doctor? |
| 2  that's when she came back. She was acting a | 2  A. Yes. |
| 3  little like she really didn't want to help me, I | 3  Q. All right. Did you ever tell anyone |
| 4  guess. | 4  at the hospital what happened? |
| 5  Q. Okay. Did you hear the conversation | 5  A. I tried to, but that's when the |
| 6  between the driver officer and the doctor? | 6  officer cut me off. |
| 7  A. No, sir. | 7  Q. Other than that time, did you ever |
| 8  Q. All right. Did you hear any | 8  have a time when you could tell anybody what |
| 9  conversations between either of the officers and | 9  happened? |
| 10  any of the medical people there? | 10  A. No. |
| 11  A. No, sir. | 11  Q. Did you ever tell anybody at the |
| 12  Q. After -- did the driver officer and | 12  hospital you had been drinking? |
| 13  the doctor have this conversation before you got | 13  A. No, I don't drink. |
| 14  any treatment? | 14  Q. All right. Did you drink back then? |
| 15  A. Say what? | 15  A. No, never. I don't like drinking. |
| 16  Q. You mentioned that the driver officer | 16  Q. All right. Did you ever tell anyone |
| 17  and this doctor went over and had a conversation? | 17  at the hospital that you had been using drugs |
| 18  A. Yes, sir. | 18  that night? |
| 19  Q. Did that happen before you received | 19  A. No. |
| 20  any treatment? | 20  Q. Had you been using drugs that night? |
| 21  A. Yes, sir. | 21  A. No. |
| 22  Q. All right. After the doctor came | 22  Q. All right. So you told me about the |
| 23  back, what kind of treatment did you receive? | 23  stitches, you told me about the cream you got |

| 106 | 108 |
|---|---|
| 1  A. She -- it felt like she put a needle | 1  under your eye, and then the other things the |
| 2  in my forehead. It was, like, numb a little bit, | 2  doctor did to the cut on your eyebrow. Did you |
| 3  but I still felt it. She poured, like -- I don't | 3  receive any other treatment? |
| 4  know what it was, it was, like, something clear, | 4  A. That's it. They just, like, put a |
| 5  and I guess that's when they started stitching it | 5  little gauze over it, and they just let me go |
| 6  up and stuff like that. | 6  after I got the stitches and stuff. |
| 7  Q. All right. So you got stitches in | 7  Q. Okay. Other than the cuts that you |
| 8  your eyebrow? | 8  had, and the scrapes, did you ever tell anyone at |
| 9  A. Yes, sir. | 9  the hospital that you had any other injuries? |
| 10  Q. Do you know how many stitches? | 10  A. No. |
| 11  A. 12, I think. | 11  Q. And you think you were there for about |
| 12  Q. 12, okay. Are those the only stitches | 12  a half hour? |
| 13  you received, or did you get stitches in other | 13  A. Yes. |
| 14  places, too? | 14  Q. And then where were you taken after |
| 15  A. That's it. | 15  you left there? |
| 16  Q. All right. Other than the care that | 16  A. Nothing. |
| 17  you got to your eyebrow, did you get care | 17  Q. Where did they take you? |
| 18  anywhere else? | 18  A. Oh, where did they take me? They took |
| 19  A. To my face. They gave me, like, some | 19  me back to the district. |
| 20  little cream, because it was scraped up a little | 20  Q. The same two officers? |
| 21  bit. | 21  A. Yes. |
| 22  Q. Did you put the cream on or did they? | 22  Q. When you got back to the district, |
| 23  A. They did. | 23  where did they put you? |

## 109

1    A.    In the juvenile room.
2    Q.    All right.  Who was in the juvenile
3    room with you?
4    A.    I think it was the officer at the
5    desk, and the driver, and I don't know where the
6    passenger went.
7    Q.    So you were in the juvenile room with
8    the driver officer --
9    A.    Yes.
10   Q.    -- another officer at the desk --
11   A.    Yes.
12   Q.    -- and that's it?
13   A.    Yes.
14   Q.    Okay.  Did you have any conversations
15   with the officers in there, that you remember?
16   A.    Not to my knowledge.
17   Q.    How long were you in the juvenile
18   room?
19   A.    Not that long, he was just saying,
20   like, I've got to get you home.  He asked me,
21   like, what's my mother's number, stuff like that.
22   Q.    Did you hear any conversations between
23   the officers in there, while you were in the

## 110

1    juvenile room?
2    A.    No.
3    Q.    Did you give them your mom's number?
4    A.    Yes.  Can I go to the bathroom?  I
5    have to go really bad.
6          (Whereupon a break was
7          taken.)
8          MR. GAINER:  Can you read the last
9    question back, I've forgotten where I stopped.
10         (Whereupon the record
11         was read back by the court reporter.
12   BY MR. GAINER:
13   Q.    While you were in the youth office, or
14   you said the youth room I think, did you have any
15   conversation with either of the officers about
16   your birthday?
17   A.    No.
18   Q.    How about your age, did you have any
19   conversations with them about your age?
20   A.    No, the youth officer asked me, so I
21   told him.
22   Q.    What did you tell him?
23   A.    I told him my name and my birthday.

## 111

1    Q.    All right.  What did he -- I mean, how
2    did he ask you?
3    A.    He asked me, like, what's your name,
4    and I told him, Terrence Barber.  He asked me
5    what's my age, I told him 16.  He asked me what's
6    my birthday.
7    Q.    And what birthday did you tell him?
8    A.    2/14/1991.
9    Q.    Okay.  Do you have any idea when the
10   officers did their paperwork on you?  Were you
11   present for that?
12   A.    No.
13   Q.    Did any of the officers ever ask me
14   if your birthday was February 14, 1988?
15   A.    Did they ever ask me that?
16   Q.    Yeah.
17   A.    No.
18   Q.    Did any of the officers -- the youth
19   officer, or either of the officers that arrested
20   you, or any other officer, ever tell you that
21   your record indicated that at one point you had
22   given a birthday of February 14, 1998 (sic)?
23   A.    No.

## 112

1    Q.    Okay.  Had you ever been arrested
2    prior to this, where you told anyone from the
3    police department that you were born on
4    February 14, 1998?
5    A.    No.
6    Q.    Do you know anybody born on
7    February 14, 1998?
8    A.    No.
9    Q.    After you -- how long do you think you
10   were in the youth office?
11   A.    I was waiting there for, like, at
12   least 45 minutes.  It was just me and the youth
13   officer.  The other officer, he just left.
14   Q.    Okay.  I suspect that all the
15   questions I just asked you about that birthday, I
16   think I said them all wrong, because I think I
17   said 1998.  So let me say them again to be sure.
18        Did anybody ever tell you, while you
19   were at the police station, that they had a
20   record of you being born on February 14, 1988?
21   A.    No, sir.
22   Q.    Have you ever been arrested by the
23   Chicago Police Department, and given the birthday

## 113

1  for you, February 14, 1988?
2      A.    No, sir.
3      Q.    Have you ever obtained any knowledge
4  from anywhere, that your police record indicates
5  that you were born February 14, 1988?
6      A.    No, sir.
7      Q.    Do you know anyone with the birthday,
8  February 14, 1988?
9      A.    No, sir.
10     Q.    Now, let's go back to where I was
11  going to go before I realized I had screwed that
12  up.
13          How long do you think you were in the
14  youth office?
15     A.    Probably about 45 minutes.
16     Q.    Did you have any idea what time it was
17  when you were in the youth office?
18     A.    No, I stopped paying attention to the
19  time.
20     Q.    Okay.  Where did you go after you left
21  the youth office?
22     A.    The youth officer, they was just
23  trying to contact my mom.  They couldn't get

## 114

1  ahold of her for me.  And after a while, she
2  asked -- that's when they released me.
3      Q.    Did you ever go into the lockup?
4      A.    Yes.
5      Q.    At what point did you go into the
6  lockup?
7      A.    I think it was -- I can't really
8  remember the time, but I know I took a photo
9  picture.
10     Q.    A mug shot?
11     A.    Yes.
12     Q.    All right.  Were you fingerprinted?
13     A.    Yes.
14     Q.    Were you ever put into a cell in the
15  lockup, after your first problem in the cell
16  where you hit your head?
17     A.    No.
18     Q.    Actually, that's a poorly worded
19  question.  Let me ask it a different way.
20          Were you ever placed into a cell in
21  the lockup after you had returned from the
22  hospital?
23     A.    No.  I think this was -- the time I

## 115

1  was photographed and fingerprinted, it was after
2  I returned from the hospital.
3      Q.    Right.  And I understand that you were
4  in the lockup when you got photographed and
5  fingerprinted.  My question is, after you
6  returned from the hospital, were you ever put
7  back into a holding cell?
8      A.    No, I was just in the youth room.
9      Q.    So you stayed in the youth room the
10  whole time, other than when you got fingerprinted
11  and photographed?
12     A.    Yes, sir.
13     Q.    After you left the youth room, were
14  you released?
15     A.    Yes, sir.
16     Q.    All right.  Do you know what time it
17  was when you were released?
18     A.    Not really, I just know it was dark.
19     Q.    Was it the next day?
20     A.    No, it was the same day.
21     Q.    It was still December --
22     A.    14.
23     Q.    -- 14th?

## 116

1      A.    Yes, sir.
2      Q.    Who were you released to?
3      A.    My mother.
4      Q.    Okay.  Did you hear your mom have any
5  conversations with anyone at the police
6  department?
7      A.    Not until she just seen me.  She was,
8  like, what happened, stuff like that.
9      Q.    Who did she say that to?
10     A.    She was asking the officer that was at
11  the front desk.  They called my name over the
12  intercom.
13     Q.    What did the officers at the front
14  desk tell her?
15     A.    They didn't know.
16     Q.    So it wasn't the arresting officers?
17     A.    No.
18     Q.    Where did the arresting -- were the
19  arresting officers still around when you were
20  released?
21     A.    No.
22     Q.    So you were released by somebody else?
23     A.    Yes, by the youth officer.

---

### 117

1    Q.   When's the last time you saw either of
2  the arresting officers that night?
3    A.   I didn't see them again.
4    Q.   What I'm saying is, you mentioned that
5  the driver officer was in the youth office with
6  you at some point?
7    A.   Yes, and then he left.
8    Q.   Is that the last time you saw either
9  of them?
10    A.   Yes, sir.
11    Q.   Okay.  Do you have any idea what time
12  it was when he left?
13    A.   No, sir.
14    Q.   Have you seen either of them again
15  since then?
16    A.   The driver.
17    Q.   Where did you see him?
18    A.   I seen him on 1365 North Hudson.
19    Q.   When?
20    A.   On 2008, the day Obama was elected for
21  president.
22    Q.   Were you still living there at that
23  time?

### 118

1    A.   No.  The mother of my baby was.
2    Q.   So you were visiting?
3    A.   Yes.
4    Q.   Where exactly in that area did you see
5  him?
6    A.   Right -- like, in the same position
7  that he was in the security guard booth.
8    Q.   Did you have any conversations with
9  him?
10    A.   No, I just told him I remember him.
11    Q.   What did he say to you?
12    A.   He didn't say nothing.
13    Q.   What about the passenger officer, did
14  you ever see him again?
15    A.   No.
16    Q.   Do you have any idea how long total
17  you were in custody?
18    A.   Not really.
19    Q.   Okay.  And you were never taken to the
20  county jail this night?
21    A.   No, sir.
22    Q.   Did you have to bond out?
23    A.   No, sir.

### 119

1    Q.   At some point did you go to court for
2  this?
3    A.   I really can't remember going to court
4  for it.
5    Q.   All right.  Do you have any idea what
6  happened to this case?
7    A.   Not really.
8    Q.   Do you know what you were charged
9  with?
10    A.   They never told me.
11    Q.   Do you know now what you were charged
12  with?
13    A.   Not really.
14    Q.   Okay.  Aside from seeing the driver
15  officer on the day Obama was elected, did you
16  ever see him any other time since this?
17    A.   No.  I was told by the OPS
18  investigator, that he won't be around the area.
19  That's what he told me, like, the next day, when
20  I talked to the OPS investigator.
21    Q.   Okay.  Do you remember who -- the OPS
22  investigator's name?
23    A.   No.

### 120

1    Q.   Did he tell you what he meant by that?
2    A.   No, he didn't say.
3    Q.   Did you ever come by the knowledge
4  that there were complaints signed against you on
5  this night?
6    A.   No.
7    Q.   Did you ever have any discussions with
8  any of the security guards about what happened
9  after you were released?
10    A.   No.
11    Q.   Did you ever have any conversations
12  with Michael Jones or Isis Walker about what
13  happened after you were released?
14    A.   No.
15    Q.   I mean, I know you told me that
16  Michael Jones said, I can't believe that happened
17  to us, or something like that, right?
18    A.   Yeah.
19    Q.   Other than that, have you had any
20  other conversations with him about this?
21    A.   No.
22    Q.   Other than your attorney, have you had
23  any conversations with anybody about this arrest

## 121

1  and this lawsuit, since the time you were
2  released?
3      A.    No.
4      Q.    What about your mom?
5      A.    Yeah, I talked to my mother.
6      Q.    What did you talk about with her?
7      A.    She was just not really -- basically
8  nothing.  She was just saying, how do I feel
9  after all this.
10      Q.    When's the last time you talked to
11  your mom about this?
12      A.    Like, about six months ago.
13      Q.    So it's been a while?
14      A.    Yeah.
15      Q.    All right.  I'm going to talk a little
16  bit about your medical treatment.  Actually,
17  before I do that, let me ask you a quick
18  question.
19          Have we now talked about all the
20  conversations you had with either of the
21  arresting police officers on the night that this
22  happened?
23      A.    You said -- can you rephrase that?

## 122

1      Q.    Yeah.  We talked about a lot of
2  different conversations, things said, and things
3  that happened, on December 14, 2005.  I want to
4  make sure we're not leaving out any conversations
5  that you had with either the driver officer, or
6  the passenger officer, on that night.  So if we
7  did leave something out, tell me what it is, so I
8  don't miss it.
9      A.    On the day Obama was elected, I looked
10  at him -- I looked him in his face, and I told
11  him, I'll never forget what he did.  And that's
12  it.
13      Q.    Did he say anything else to you?
14      A.    No, he didn't say nothing.  He just
15  looked shocked.
16      Q.    Have we talked about everything now?
17      A.    Yes.
18      Q.    All conversations?
19      A.    Yes.
20      Q.    Okay.  At some point did you go back
21  to the doctor for these injuries?
22      A.    I remember going, but I can't remember
23  the day and stuff like that.

## 123

1      Q.    All right.  You had to go back and get
2  your stitches out, right?
3      A.    Yes.
4      Q.    Where did you go for that?
5      A.    No, I don't think I even went back to
6  get my stitches out.
7      Q.    How did you get your stitches out
8  then?
9      A.    They ain't out.
10      Q.    The stitches are still in there?
11      A.    Yeah.
12      Q.    I assume that the doctors told you
13  that you should go back to the doctor and get
14  your stitches out?
15      A.    Yes.
16      Q.    And you just didn't go?
17      A.    Yes.
18      Q.    Did you ever receive any other medical
19  care for the injuries to your eyebrow and your
20  face, other than what you told me about the night
21  of the incident?
22      A.    Just painkillers, ibuprofen.
23      Q.    Okay.  You never went and saw a doctor

## 124

1  again for those injuries?
2      A.    No.
3      Q.    All right.  You took some ibuprofen
4  that you could buy at the drugstore?
5      A.    Yes.
6      Q.    Did you ever take any other medicine
7  for those injuries?
8      A.    Not really.  I just smoked marijuana a
9  little bit to get rid of the headache.
10      Q.    Okay.  Other than the ibuprofen and
11  the marijuana, did you ever take anything else
12  for your injuries?
13      A.    No.
14      Q.    All right.  This is going to sound
15  like a silly question.  But no doctor ever told
16  you you should smoke marijuana for your injuries,
17  right?
18      A.    Yeah.
19      Q.    What I said was right?
20      A.    Yeah.
21      Q.    Okay.  Did they ever x-ray you that
22  night?
23      A.    No.

## 125

1    Q.    Prior to this incident, had you ever
2  suffered any head injuries?
3    A.    No.
4    Q.    My question includes concussions, or
5  scars, or cuts, or anything like that.
6    A.    Before the incident?
7    Q.    Yeah.
8    A.    No, sir.
9    Q.    Have you since?
10   A.    No, sir.
11   Q.    Okay.  You've never been diagnosed
12 with a concussion?
13   A.    Can you rephrase that?
14   Q.    Yeah.  Has a doctor ever told you that
15 you suffered a concussion, at any time?
16   A.    Not to my knowledge.
17   Q.    Have you ever had stitches, other than
18 this time?
19   A.    Yes.
20   Q.    Where?
21   A.    In my thigh.
22   Q.    Anywhere else?
23   A.    My knee.

## 126

1    Q.    Okay.  Anywhere else?
2    A.    No.
3          (Whereupon a discussion
4       was had off the record.)
5  BY MR. GAINER:
6    Q.    Before we were interrupted, my
7  question was, other than your face, your thigh,
8  and your knee, did you ever get stitches anywhere
9  else?
10   A.    No, sir.
11   Q.    Did you ever suffer any cuts or
12 bruises to your head, other than what you told me
13 about today?
14   A.    No, sir.
15   Q.    Do you still have scars?
16   A.    Yes.
17   Q.    From this?
18   A.    Yes, sir.
19   Q.    Can you just tell me -- we have to do
20 it so it's clear on the record.  So tell me where
21 you still have a scar.
22   A.    Right above my right eye.
23   Q.    On your eyebrow?

## 127

1    A.    Yes.
2    Q.    And it goes up from your eyebrow?
3    A.    Yes, sir.
4    Q.    Has any doctor ever told you that if
5  you got the stitches out, the scar wouldn't be as
6  bad?
7    A.    No.  I really didn't want to go back
8  to that hospital, because it was, like, they
9  really wasn't trying to help me.
10   Q.    Okay.  Did you ever go to any other
11 hospital for these injuries, other than Lincoln
12 Park?
13   A.    Just Mount Sinai, the hospital that I
14 was born in.
15   Q.    Did they treat you at Mount Sinai for
16 the injuries to your eyebrow and your face?
17   A.    No, they didn't treat me for it.
18   Q.    My question then is a little
19 different.  Did you ever go to any other hospital
20 to get treatment for the injuries to your eyebrow
21 or under your eye?
22   A.    No.
23   Q.    How about any other doctor?

## 128

1    A.    No.
2    Q.    All right.  Other than that scar on
3  your eyebrow -- or going up from your eyebrow, do
4  you have scars anywhere else from this incident?
5    A.    I've got a permanent black eye
6  underneath.
7    Q.    What did you say?
8    A.    I've got a permanent black eye.
9    Q.    And did any doctor ever tell you that
10 that permanent black eye was caused by this
11 incident?
12   A.    No.
13   Q.    Okay.  And just to be clear, I know
14 that we'll go over this in a second in your
15 interrogatories, but -- actually, I'll wait until
16 then -- strike that.
17          Did you ever receive any medical bills
18 for this?
19   A.    I actually don't know.
20   Q.    Did you ever pay any medical bills for
21 this?
22   A.    No, not to my knowledge.
23   Q.    Do you know if your mom ever paid any

## 129

1  medical bills for this?
2      A.   I never asked her about it.
3      Q.   So you don't know one way or the other
4  if there were any medical bills?
5      A.   Right.
6      Q.   Other than that, do you know if you
7  suffered any out-of-pocket expenses as a result
8  of this incident?
9      A.   No, I don't know.
10     Q.   Okay.  All right.  I'm going to give
11  you what we'll mark as Exhibit 1.
12          (Exhibit No. 1 marked
13          for identification.)
14  BY MR. GAINER:
15     Q.   Okay.  I'm going to hand you what the
16  court reporter just marked at Plaintiff's Exhibit
17  No. 1, or Plaintiff 1, for this deposition.  Have
18  you seen this document before?
19     A.   Yes, sir.
20     Q.   Okay.  Flip to the last page, will
21  you.  You see there that there's a signature; is
22  that your signature?
23     A.   Yes, sir.

## 130

1      Q.   Okay.  These are interrogatories that
2  you answered in conjunction with this lawsuit.
3  Is that your understanding?
4      A.   Yes, sir.
5      Q.   I'd like to go to interrogatory number
6  four, please, which is on page two of this.  And
7  this is a question about injuries that you
8  suffered as a result of this incident.
9      A.   Yes.
10     Q.   And we've talked a lot about your
11  physical injuries, the cut on your face, the
12  scar, and hitting your head.  I'd like to ask you
13  about some of the emotional injuries that you
14  describe here.  If you look, it's the third to
15  last sentence, I'm talking about the sentence
16  that says, plaintiff further suffered anguish,
17  humiliation, pain, and emotional distress as a
18  result of these injuries.  Do you see that?
19     A.   Yes.
20     Q.   Can you tell me -- can you describe
21  for me the anguish, humiliation, pain, and
22  emotional distress that you've suffered as a
23  result of this incident?

## 131

1      A.   Well, like, I have constant headaches.
2  It's, like, I'm scared of the police officer a
3  little bit.  Just -- that's probably about it.
4      Q.   All right.  Let's talk first about the
5  headaches.  Describe for me the constant
6  headaches, how often do you get them?
7      A.   Like, when I go to sleep, wake up,
8  when I get up out of bed, sometimes before I eat,
9  like, late at night, I'll try to go sleep, stuff
10  like that, in the middle of the day.
11     Q.   Is this every day?
12     A.   It's like every other day.
13     Q.   So every other day.  How long has this
14  been happening?
15     A.   Ever since it occurred, the accident
16  occurred.
17     Q.   So every other day, for at least four
18  years, you've been suffering headaches when you
19  wake up, when you go to sleep, and what was the
20  other thing you said?
21     A.   Like, sometimes around when I eat.
22     Q.   Around dinner -- or whenever you eat,
23  or a particular meal?

## 132

1      A.   Probably, like about lunch or
2  something.
3      Q.   So every other day for the last four
4  years, you've been suffering headaches when you
5  wake up, when you go to sleep, when you get out
6  of bed, and before you eat lunch?
7      A.   Yes, sir.
8      Q.   Okay.  Why do you think these
9  headaches are associated with this?
10     A.   'Cause it just hurts in the same spot.
11     Q.   Describe for me where it hurts.
12     A.   My right eyebrow, above my right
13  eyebrow.
14     Q.   All right.  Have you seen any doctors
15  for these headaches?
16     A.   Not really.
17     Q.   All right.  Has any doctor or any
18  other medical care provider, meaning nurse or
19  anyone else, ever told you that these headaches
20  were caused by this incident?
21     A.   No.  My -- the mother of my baby, she
22  was -- I mean, she was getting her degree in the
23  -- how can I say this?  Like, the nursing and

---

133

1    stuff, and she told me I should go to the
2    hospital, and stuff like that.
3        Q.    Which one -- who is it that said this?
4        A.    Dominique Stephson.
5        Q.    She's getting a degree in nursing?
6        A.    Yes.
7        Q.    And she told you you should go to the
8    hospital for your headaches?
9        A.    Yes.
10       Q.    Did she ever tell you that the
11   headaches were caused by this incident?
12       A.    Not really.
13       Q.    Has anyone ever told you that, that
14   your headaches were caused by this incident?
15       A.    No.
16       Q.    Have you ever gone to the hospital for
17   these headaches?
18       A.    I went one time, and that was when I
19   got the stitches in my leg, and that's when I got
20   painkillers.
21       Q.    When you were getting the stitches in
22   your leg, did you tell them about your headaches?
23       A.    Yes.

---

134

1        Q.    What hospital was that?
2        A.    I think it was Cook County Hospital.
3        Q.    When was that?
4        A.    I'm not sure. I know it was the
5    summer of '09. I don't know exactly.
6        Q.    The summer of '09 you say?
7        A.    Yes.
8        Q.    And you complained about your
9    headaches then?
10       A.    Yes.
11       Q.    Can you tell me your Social Security
12   number?
13       A.
14       Q.    Do you know the names of any of the
15   doctors or nurses who treated you at Cook County
16   Hospital on this occasion?
17       A.    No.
18       Q.    I know you said you got stitches in
19   your leg, but was there anything else -- any
20   other treatment that you received while you were
21   there that we could use to figure out how we can
22   get the records from that?
23       A.    No.

---

135

1        Q.    How did you hurt your leg?
2        A.    Climbing over a gate.
3        Q.    All right. Other than that, did you
4    ever look for any medical treatment for --
5              (Whereupon a guard
6              entered the room.)
7              MR. GAINER: Let's go off the record.
8              (Whereupon a break was
9              taken.)
10   BY MR. GAINER:
11       Q.    Other than this treatment you received
12   at Cook County Hospital, when you complained
13   about your headaches, have you received any other
14   medical treatment for your headaches?
15       A.    No, they just keep prescribing me the
16   pain pills. They really don't work, to tell you
17   the truth.
18       Q.    Who keeps prescribing you painkillers?
19       A.    The doctors that I went to to get my
20   leg stitches, she just told me I should get some
21   painkillers.
22       Q.    Okay. For you headaches --
23       A.    Yeah.

---

136

1        Q.    -- or for your stitches?
2        A.    No, for my headache.
3        Q.    All right. What kind of painkillers
4    did she prescribe?
5        A.    Ibuprofen, but she told me to get a
6    higher dose, like 800 milligrams.
7        Q.    Did she actually write you a
8    prescription, or did she tell you to buy them at
9    the drugstore?
10       A.    She wrote me a prescription, and I
11   think it was -- and some antibiotic ointment to
12   just clean my stitches in my leg.
13       Q.    All right. But the ibuprofen was for
14   your headaches?
15       A.    Yes, sir.
16       Q.    Did your prescription run out before
17   you came to prison?
18       A.    It was, like, almost at the end. It
19   didn't run out, but it was almost at the end.
20       Q.    So you never got it renewed?
21       A.    No.
22       Q.    Are you taking pain medication for
23   your headaches now?

---

**137**

1    A.    Not really.
2    Q.    Are you still suffering from your
3  headaches?
4    A.    Yes.
5    Q.    Any other medical treatment for those
6  headaches that we haven't talked about?
7    A.    No.
8    Q.    Go to number ten -- actually, no, wait
9  one second.  These emotional injuries, you said
10  that your emotional injuries are that you're
11  scared of that police officer?
12    A.    Yes.
13    Q.    And then you said that that's it,
14  right?
15    A.    Yes.
16    Q.    Yes?
17    A.    Yes.
18    Q.    All right.  Did you ever see a doctor
19  for these emotional injuries?
20    A.    No.
21    Q.    Have you received any treatment for
22  these emotional injuries?
23    A.    No.

---

**138**

1    Q.    Have you ever told anyone, other than
2  telling me right now, aside from your attorney,
3  about these emotional injuries?
4    A.    No.
5    Q.    Okay.  Now, go to number ten, please.
6  This is a question about lost income.  And you
7  see the answer is actually on the next page, at
8  the top of the next page.  It's true that you
9  weren't working when this happened, right?
10    A.    No, I wasn't.
11    Q.    Right.  What I said was true?
12    A.    Yes.
13    Q.    So you're not making a lost income
14  claim here, right?
15    A.    I don't think so.
16    Q.    If you go to number 20, this is a
17  question about expenses and damages.  I'll wait
18  until you get there.  Okay.  Number 20, you'll
19  see it's a question about your expenses and
20  damages.  The first page, the first line says,
21  plaintiff seeks damages for humiliation,
22  indignities, mental and physical pain and
23  suffering.  We have talked about all your mental

---

**139**

1  pain and suffering, right?
2    A.    Yes.
3    Q.    Okay.  Have we talked about all of
4  your humiliations and indignities?
5    A.    Can you rephrase that?  Can you, like,
6  give me the definition of both of them?
7    Q.    Sure.  Apparent from this answer is
8  that you were humiliated by this.  Do you know
9  what humiliated means?
10    A.    A little bit, but not really.
11    Q.    It means that you were embarrassed,
12  something like that.
13    A.    Yes.
14    Q.    Were you embarrassed by this?
15    A.    Yes.
16    Q.    How were you embarrassed?
17    A.    I had to walk around with my face just
18  swollen.  Every day people asked me questions
19  like, what happened, who you get beat up by,
20  stuff like that.
21    Q.    Okay.  How often did that happen?
22    A.    For, like, about a week straight.
23    Q.    How many times do you think people

---

**140**

1  asked you what happened?
2    A.    I can't even explain.  It was
3  everybody, everybody that I talked to, everybody
4  that I just -- they'd just look at me and ask me
5  what happened.  Even people that I don't know,
6  they asked me what happened.
7    Q.    Why were you embarrassed by that?
8    A.    Because I really didn't like the
9  feeling of just walking around with my face all
10  puffy, my eye, you know, split, stuff like that.
11  It was just kind of crazy, because my eye was
12  black for a long time.
13    Q.    Did you suffer from similar
14  embarrassment when you got stitches in your leg?
15    A.    No.
16    Q.    What about when you got stitches in
17  your knee?
18    A.    No.
19    Q.    What's the difference you think?
20    A.    They can't see it.  My stitches in my
21  head was visible.
22    Q.    All right.  Are there any other
23  injuries or damages that we haven't talked about,

141

1   that you suffered from? And just to run them
2   down for you, I think we've talked about
3   humiliation, we've talked about your mental --
4   being scared of the officer, we've talked about
5   your medical a lot, and we've talked about --
6   well, I think that's all we talked about. What
7   did we miss?
8           MR. KSIAZEK: We talked about
9   headaches.
10  BY MR. GAINER:
11      Q.   We talked about headaches and your
12  medical, and stuff like that. Did we miss
13  anything?
14      A.   It was, like, in the summertime, like
15  when I'd be working a little bit, it just -- I'd
16  got to always take breaks and just chill, and I
17  be getting a lot of nose bleeds and stuff like
18  that.
19      Q.   Okay. And you think these nose bleeds
20  are associated with this?
21      A.   I guess so, because, like, it would be
22  like my head would be pounding real hard, then my
23  nose would start bleeding, and that's when I got

142

1   to chill or take a little break or something.
2       Q.   Okay. And this happened when you were
3   working?
4       A.   Yes.
5       Q.   And only when you were working?
6       A.   Just like -- yes, when I was out in
7   the sun.
8       Q.   So when you were working for
9   Portillos?
10      A.   Yes.
11      Q.   Which Portillos did you work at?
12      A.   Downtown Chicago.
13      Q.   The one on --
14      A.   Ontario.
15      Q.   Would you work inside?
16      A.   I was working inside for, like, a
17  little while, then I started working outside
18  taking cash.
19      Q.   And you said you worked for the summer
20  of '08?
21      A.   Yes.
22      Q.   We talked about the fact that you
23  don't know anything about your medical bills,

143

1   right?
2       A.   Yes.
3       Q.   Do you know anything about your
4   attorney's fees?
5       A.   To my knowledge, a little bit, but not
6   really fully.
7       Q.   I don't want to know anything about
8   what you talked with your attorney about, because
9   I'm not entitled to know that. But if you know
10  the amount of attorney's fees you owe --
11      A.   No.
12      Q.   Okay. Go to number 22. This is the
13  -- a question about the police officers --
14      A.   Yes.
15      Q.   -- that you say -- or that arrested
16  you this night?
17      A.   Yes.
18      Q.   Okay. The first officer you describe,
19  the driver of the police car, we've talked a lot
20  about, you say he was 5'11" to six feet tall, 165
21  to 175 pounds, white, with a bald spot, light
22  brownish hair, no glasses, dark brown eye -- dark
23  brown eyes, no facial hair, dark blue vest, dark

144

1   blue pants, and long-sleeved light baby-blue
2   Chicago Police Department shirt?
3       A.   Yes, sir.
4       Q.   Okay. And then the passenger you --
5       A.   Hold on. I think you all got this
6   messed up. The driver is shorter than the
7   passenger. It might be mixed up right here.
8       Q.   Okay. Tell me what's in here that's
9   inaccurate.
10      A.   The driver, his height. I don't think
11  he's that tall.
12      Q.   Okay. How tall do you think he is?
13      A.   About 5'9", that's what I think.
14      Q.   Anything else about that description
15  that is inaccurate?
16      A.   No.
17      Q.   All right. In here you've got 165 to
18  175 for weight, and earlier you told me 140.
19  Which one do you think is closer?
20      A.   I'd say -- I think -- I'd say at least
21  about in between -- I'd say at least in between
22  140 and 165.
23      Q.   Okay. Fair enough.

| 145 | 147 |
|---|---|

**145**

```
 1      A.    Because I think 165 and 175, that
 2   would be a little too overweight.
 3      Q.    Okay.
 4      A.    But he was a little muscular.
 5      Q.    All right.  Is there anything about
 6   the description of passenger number two -- or the
 7   passenger, officer number two, that you think is
 8   inaccurate?
 9      A.    No.
10      Q.    All right.  I'm now going to show you
11   what we'll mark as Exhibit 2.
12               (Exhibit No. 2 marked
13               for identification.)
14   BY MR. GAINER:
15      Q.    All right.  This is Exhibit No. 2 for
16   your deposition.  Have you seen this document
17   before?
18      A.    Yes, sir.
19      Q.    Flip to the last page, please.  Again,
20   that's your signature, right?
21      A.    Yes, sir.
22      Q.    Did you understand when you signed
23   this that you were answering these questions
```

**147**

```
 1      A.    No.
 2      Q.    As you sit here right now, do you
 3   still believe that you weren't arrested before
 4   this incident?
 5      A.    I think so.
 6      Q.    You think you were, or you don't think
 7   so?
 8      A.    I think I wasn't.  I can't tell.
 9      Q.    The PSMV charge that you're now here
10   for, did you plead guilty of that, or were you
11   convicted?
12      A.    No, I pled guilty.
13      Q.    Okay.  For the probation violation,
14   did you plead guilty to that, or did you have a
15   hearing?
16      A.    I pled guilty to that.  I had a
17   hearing.
18           MR. GAINER:  Okay.  All right.  Last
19   exhibit.
20               (Exhibit No. 3 marked
21               for identification.)
22   BY MR. GAINER:
23      Q.    All right.  This is Exhibit No. 3 for
```

| 146 | 148 |
|---|---|

**146**

```
 1   under oath?
 2      A.    Yes, sir.
 3      Q.    I want to stay on the first page.
 4   This is a question about previous arrests,
 5   correct, as far as you can tell from looking at
 6   it?
 7      A.    Yes, sir.
 8      Q.    Okay.  And you helped give your
 9   attorney information to answer these questions,
10   right?
11      A.    Yes, sir.
12      Q.    Okay.  The first item at the bottom of
13   this page, where it says number one, it indicates
14   that you were arrested on October 2nd, '05, and
15   November 9, '05, at 1365 North Hudson.  Do you
16   remember those arrests?
17      A.    Not really.
18      Q.    Okay.  Do you disagree with the fact
19   that you were arrested on those dates?
20      A.    I can't really tell you.
21      Q.    Okay.  Both of those dates are before
22   this incident.  Does that help refresh your
23   memory about being arrested before this incident?
```

**148**

```
 1   your deposition.  Have you seen that document
 2   before?
 3      A.    Yes.
 4      Q.    The second to the last page, if you
 5   look at that quickly, it's got a number on it
 6   that ends in 32.  Do you see it?
 7      A.    Yes.
 8      Q.    At the bottom there, there's a
 9   signature next to an X, is that your signature?
10      A.    Yes, sir.
11      Q.    To the best of your knowledge, next to
12   your signature, is that your mom's signature?
13      A.    Yes, sir.
14      Q.    Do you know what this document is?
15      A.    A little bit.
16      Q.    Tell me what you think it is.
17      A.    Like, just, basically most of the
18   questions that you asked.
19      Q.    All right.  This is -- is it true that
20   your mom registered a complaint with the police
21   department after this happened?
22      A.    Yes, sir.
23      Q.    Did you meet with an investigator?
```



149

1    A.    Yes, sir.
2    Q.    Okay.  Did you give a statement to
3  that investigator?
4    A.    Yes, sir.
5    Q.    Does this document represent the
6  statement that you gave?
7    A.    Yes, but I don't know if this was
8  given to me a long time ago or -- with the
9  investigator?
10   Q.    Right.  But my question is, you told
11 me that you've looked at this before?
12   A.    Yes.
13   Q.    Do you recall giving this statement to
14 the investigator?
15   A.    Yes.
16   Q.    And if you go to the first page, this
17 is dated -- flip back to the first page for a
18 second.  One more.  This is dated December 16,
19 2005, up at the top, right?
20   A.    Okay.  Yes, sir.
21   Q.    Is that the date that you gave this
22 statement to the investigator?
23   A.    Yes, sir.

150

1    Q.    Is it fair to say that when you gave
2  this statement to the investigator, all these
3  events were fresh in your mind, right?
4    A.    Yes, sir.
5    Q.    Because the date you gave it was two
6  days after the incident occurred, right?
7    A.    Yes, sir.
8    Q.    Did you look at a copy of this
9  document before your deposition today?
10   A.    Yes, sir.
11   Q.    Okay.  Do you remember who was present
12 when you gave this statement?
13   A.    My mother and the investigator.
14   Q.    Anybody else?
15   A.    No.
16   Q.    On the first page you'll see that --
17 on the fourth line -- third or fourth line on the
18 first page, you'll see that it indicates you were
19 outside talking to Security Guard Washington
20 before the police came.  Do you see that?  It's
21 right here, Security Guard Washington.  Do you
22 see that part?
23   A.    Yeah.

151

1    Q.    Were you outside talking to Security
2  Guard Washington before the police came?
3    A.    Let me think about it.
4    Q.    Sure, take your time.
5    A.    I don't really remember the
6  conversation, but I remember, like, a few words.
7    Q.    All right.  Was Washington outside
8  with you when the police came?
9    A.    He went back inside.
10   Q.    Before the police came?
11   A.    Yeah.
12   Q.    Okay.  How do you know -- a little bit
13 further down you say, two white male uniformed
14 officers responded to a call of someone fighting.
15 That's a little different than what you told me
16 earlier.  How do you know that, or did you know
17 that at the time?
18   A.    Say what?
19   Q.    A little bit below where it says,
20 Mr. Washington, you indicate that two white male
21 uniformed officers responded to a call of someone
22 fighting.  Do you see that?
23        MR. KSIAZEK:  I'm just going to

152

1  object.  I'm not sure if we've established that
2  this is the witness's handwriting.
3        BY MR. GAINER:  We've established the
4  witness signed it.
5        MR. KSIAZEK:  Right.
6  BY MR. GAINER:
7    Q.    Is this your handwriting?
8    A.    No.
9    Q.    Okay.  Who wrote this?
10   A.    I think the investigator.
11   Q.    All right.  If you look at the last
12 page -- actually, the second to the last page,
13 back where we were earlier, there's a paragraph
14 that says -- it's the second to the last
15 paragraph on -- the page says 32.  After having
16 read this summary of four pages, being given the
17 opportunity to make corrections, additions, or
18 subtractions, I find it to be a true and accurate
19 summary of my interview with Investigator Webb.
20 Do you remember reading that on the day that you
21 got this?
22   A.    I don't remember.
23   Q.    You do remember signing this?

## 153

1   A.   Yes.
2   Q.   Okay.  Going back to the first page,
3  where it says that two officers responded to a
4  call of someone fighting, is that your
5  understanding of why the police were there?
6   A.   Not really, not to the best of my
7  knowledge.  I heard some noise, but I didn't hear
8  nobody fighting.
9   Q.   Okay.
10   A.   The only time the police is going to
11  come is when somebody having, like, a
12  disturbance, or something like that.
13   Q.   Okay.  So as you sit here today, you
14  don't know whether or not they were responding to
15  somebody fighting?
16   A.   Yeah, I don't know.
17   Q.   Okay.  But you agree that this is a
18  summary of the statement that you gave, based on
19  the fact that you signed it on December 16, 2005?
20   A.   Can you rephrase it?
21   Q.   Yeah.  Although that's different than
22  what you remember, the part about the fighting --
23   A.   Okay.

## 154

1   Q.   -- we've already established that you
2  signed this and had an opportunity to review it
3  on December 16, 2005, right?
4   A.   Okay.
5   Q.   Is that right, what I said?
6        MR. KSIAZEK:  You have to answer out
7  loud.
8        THE WITNESS:  Yes.
9  BY MR. GAINER:
10   Q.   All right.  Let's go to -- hold on one
11  second while I find it.  I just lost it.  Okay.
12  Let's -- the page that ends -- that has the
13  number 31 on it.
14   A.   Uh-huh.
15   Q.   The last paragraph.  It says, Barber
16  stated that Security Guard Washington and Walker
17  were witnesses to officer one pushing him and
18  cursing at him while outside.  My understanding,
19  based on your testimony, is that Washington
20  wasn't there when that happened.  Do you think
21  Washington saw that happen?
22   A.   Coming back to my remember -- my
23  memory, Officer Washington, he was outside while

## 155

1  the officer was searching me.  I do remember
2  that.  I do remember, he had on, like, army
3  fatigues and, like -- an army fatigue suit.
4   Q.   Where was he standing?
5   A.   Like, in the middle of two -- in both
6  doorways.  There's two doorways.
7   Q.   All right.  My recollection of your
8  previous testimony is that the driver officer
9  grabbed your shirt, searched you and handcuffed
10  you.  Here it says that he pushed you.  Did he
11  push you while you were out there?
12   A.   No, he just yanked me like a little
13  bit.  It ain't like no push, push.
14   Q.   So he grabbed your shirt?
15   A.   Yeah.
16   Q.   Okay.  Did you ever have any
17  conversations with Security Guard Washington
18  about whether he saw you being grabbed by the
19  officer and searched on this day?
20   A.   No.
21   Q.   So are you just -- is it fair to say
22  that in your statement here, that you're just
23  guessing that he was a witness?

## 156

1   A.   No.  I'm quite sure -- it's really,
2  really going, fresh, fresh back to my memory,
3  that he was outside when this had occurred, when
4  the officer was searching me.
5   Q.   Okay.  Are you sure he was watching
6  you while you were being searched?
7   A.   Yes.  Yes.
8   Q.   He was looking toward you?
9   A.   Yes.
10   Q.   Did he say anything?
11   A.   He didn't say nothing.
12   Q.   Flip back one page to page 30.  Okay.
13  Look on the -- it's the first paragraph here, on
14  page 30, where -- starting where there's a
15  description of officer one.  You see, officer one
16  has light blond short hair, blue eyes.  Do you
17  see that part?
18   A.   Yes.
19   Q.   Okay.  Does officer one have blue eyes
20  or brown eyes?
21   A.   Brown.
22   Q.   All right.  So that's not right?
23   A.   And his hair is not blond.  So that is

|  | 157 |
|---|---|

```
 1    not right.
 2         Q.    Okay.  You reviewed this statement
 3    before you signed it, right?
 4              MR. KSIAZEK:  Object, asked and
 5    answered.
 6              THE WITNESS:  Not really.
 7    BY MR. GAINER:
 8         Q.    I'm sorry?
 9         A.    Not really.
10         Q.    But you did sign it?
11         A.    Yes.
12         Q.    All right.
13         A.    I don't remember reviewing the whole
14    -- everything, but I remember reviewing part of
15    it.
16         Q.    Do you remember telling the
17    investigator that officer one had blond short
18    hair and blue eyes?
19         A.    No. I remember telling him he was just
20    white.
21         Q.    Underneath that it says, officer two
22    was inside the 1365 building when officer one
23    pushed Barber.  Do you see that?
```

|  | 158 |
|---|---|

```
 1         A.    Yes.
 2         Q.    Okay.  Is that accurate, or is what
 3    you told me earlier on accurate, about him
 4    searching Jones while you were being searched by
 5    officer one?
 6         A.    That's inaccurate.
 7         Q.    Okay.  Do you remember telling the
 8    investigator that?
 9         A.    About him pushing me?
10         Q.    No, about officer two being inside
11    when officer one pushed you.
12         A.    No.
13         Q.    So never mind -- strike that.
14              Do you have any idea how I can get in
15    touch with Michael Jones right now?
16         A.    Not really.  I'd have to talk to my
17    mother or my brother to get his information.
18         Q.    Do they know Michael Jones?
19         A.    Yes.
20         Q.    Okay.  How does your mother know
21    Michael Jones?
22         A.    He was just a friend around the
23    neighborhood.
```

|  | 159 |
|---|---|

```
 1         Q.    Okay.  Is that the same with your
 2    brother?
 3         A.    My brother -- yes.
 4         Q.    How do I get in touch with Isis Walker
 5    right now if I wanted to?
 6         A.    She don't have no phone.
 7         Q.    No? Okay.
 8         A.    But I'm sure if you contact my mother,
 9    she will give you all the other information.
10         Q.    And you don't know where Michael Jones
11    lives?
12         A.    No.
13         Q.    You told me where your mom lives, you
14    told me where Isis Walker lives.  Do you have any
15    idea how I can get in touch with Security Guard
16    Washington?
17         A.    He works there sometimes, off and on.
18         Q.    Is he still there?
19         A.    Yes.
20         Q.    You already told me that Thorn's not
21    there anymore, right?
22         A.    No, he's not there.
23         Q.    Do you know who Ralph Jones is?
```

|  | 160 |
|---|---|

```
 1         A.    Ralph Jones?  I think he's a security
 2    guard, too.
 3         Q.    What about somebody named John Brown,
 4    do you know who that is?
 5         A.    No.
 6         Q.    Okay.  Have we talked now about all
 7    your damages in this case?
 8         A.    Yes.
 9         Q.    Have we talked about your entire claim
10    against the officers and the City in this case?
11         A.    Yes.
12         Q.    Did you meet with your lawyer today
13    before this deposition?
14         A.    Yes.
15         Q.    Okay.  Again, I don't want to know
16    what you talked about.  How long was that
17    meeting?
18         A.    I'm not sure.  Not that long.
19         Q.    Okay.  Was there anyone else present
20    for that meeting other than you and your lawyer?
21         A.    No.
22         Q.    Prior to today, had you met with your
23    lawyer before?
```

| 161 |
|---|

1     A.   Yes.
2     Q.   Was there anybody -- how many times
3  did you meet with your lawyer prior to today?
4     A.   I'm not sure.  Like, twice, I think.
5     Q.   For either of those meetings, was
6  there anyone else present besides you and your
7  lawyer?
8     A.   I know the first time I went to the
9  office I was with my mother, but it was somebody
10  else that I had before I met him, but I was by
11  myself when I talked to him.
12     Q.   The first time that you talked to your
13  lawyer, was your mom in the room?
14     A.   Yes.
15     Q.   How old were you the first time you
16  met with your lawyer?
17     A.   I can't really remember.
18     Q.   Do you remember when the meeting was?
19     A.   I know it was a little cold outside,
20  like, around October or something like that.
21     Q.   Was it October of 2009?
22     A.   I'm not really sure.
23     Q.   Were you 18?

| 162 |
|---|

1     A.   Yes.
2     Q.   All right.  What did you talk about at
3  that meeting?
4     A.   I can't really remember.  He asked me,
5  like, what was happening, what was the incident.
6  I know that part.
7     Q.   Okay.  At any time have you ever known
8  the officers' names in this case?
9     A.   No.
10     Q.   Have you ever looked at any pictures
11  of any police officers in relation to this case?
12     A.   No.
13     Q.   What documents did you look at prior
14  to the deposition today?
15     A.   The interrogaties --
16     Q.   Interrogatories?
17     A.   The interrogatories, and something
18  else I can't remember.
19     Q.   You told me already that you looked at
20  the statement that's marked Exhibit 3, right,
21  this document here?
22     A.   You say -- what did you say?
23     Q.   I think you already told me that you

| 163 |
|---|

1  looked at that before the deposition, right?
2     A.   Before this?
3     Q.   Yeah.
4     A.   I remember a little bit when I was
5  with the -- when I was with the -- when I was
6  with the --
7     Q.   Investigator?
8     A.   Yeah, investigator.
9     Q.   My question is, before today's
10  deposition, so today, before we started, did you
11  look at this, the statement in Exhibit 3?
12     A.   No.
13     Q.   Okay.  But you did look at the
14  interrogatories?
15     A.   Yes.
16     Q.   Did you look at the supplemental
17  interrogatories, what's marked as Exhibit No. 2?
18     A.   Yes.
19     Q.   Did you look at anything else?
20     A.   Just pictures and stuff.
21     Q.   What kind of pictures?
22     A.   Pictures of me.
23     Q.   I'm going to show you some pictures,

| 164 |
|---|

1  I'm not going to mark them because who knows if
2  we'll ever get another set.  But since they've
3  been produced, I'm sure that we all have copies.
4     Do you remember having your pictures
5  taken -- your picture taken on the day of this
6  occurrence?
7     A.   Yes.
8     Q.   Do you remember who took your picture?
9     A.   I know my mother took a couple of
10  them.
11     Q.   Okay.  Did anyone else take your
12  pictures?
13     A.   Investigator.
14     Q.   Did the police department ever take
15  your picture?
16     A.   Just the -- just on the -- I forgot
17  what they call it, the little photograph.
18     Q.   So your mug shot?
19     A.   Yes.
20     Q.   And then they took your picture again
21  when you talked to the investigator?
22     A.   Yes.
23     Q.   Okay.  I'm going to show you just a

## 165

1  couple of these pictures.  Did you look at that
2  picture today?
3      A.    Yes.
4      Q.    All right.  Is that you in that
5  picture?
6      A.    Yes, sir.
7      Q.    Was that one of the pictures taken
8  when you were with the investigator?
9      A.    Yes, sir.
10          MR. GAINER:  And just for the record,
11  this is -- this is not one of the ones with Bates
12  stamp, but this is attachment 12 C to the CR
13  number.
14          MR. KSIAZEK:  Okay.
15  BY MR. GAINER:
16      Q.    Are those the clothes that you were
17  wearing on the day of the incident -- strike
18  that.
19          This was taken on December 16th,
20  right, when you went to meet the investigator?
21      A.    Yes, I think so.
22      Q.    Okay.  Does that show your injuries in
23  this case?

## 166

1      A.    Yes, sir.
2      Q.    I'll show you what's attachment 12 D
3  to the CR number, which is a closer photo.  Is
4  that you in that picture?
5      A.    Yes, sir.
6      Q.    Is that one of the pictures that was
7  taken when you met with the investigator?
8      A.    Yes, sir.
9      Q.    Okay.  And that shows a scar coming up
10  from your right eyebrow with some -- looks like
11  some butterfly bandages across it, right?
12      A.    Yes, sir.
13      Q.    All right.  And is that the cut that
14  you got that required stitches?
15      A.    Yes, sir.
16      Q.    And then underneath your right eye
17  there are some scrapes, and it looks like it has
18  some cream on it.  Are those the scrapes that you
19  were talking about earlier?
20      A.    Yes, sir.
21      Q.    It looks like up above your left
22  eyebrow, there are some additional scrapes, do
23  you see those?

## 167

1      A.    Yes.
2      Q.    Are those also from this incident?
3      A.    Yes, sir.
4      Q.    Other than the injuries that are shown
5  on this photograph, attachment 12 D to the CR
6  number that we both have, did you suffer any
7  other injuries?
8      A.    No, sir.
9      Q.    All right.  I want to make sure I have
10  all the witnesses in this case.  Okay.  So I've
11  got Michael Jones, who we've talked about?
12      A.    Yes.
13      Q.    Isis Walker, who we've talked about?
14      A.    Yes.
15      Q.    Security Guard Washington, who we've
16  talked about?
17      A.    Yes.
18      Q.    The two police officers?
19      A.    Yes.
20      Q.    You?
21      A.    Yes.
22      Q.    Can you think of anyone else who has
23  any knowledge or witnessed any part of this?

## 168

1      A.    Courtney Turner.
2      Q.    Who is Courtney Turner?
3      A.    That is my brother's girlfriend.
4      Q.    Where was she when this was happening?
5      A.    She was walking up when I was getting
6  arrested.
7      Q.    So have you spoken with her about this
8  case?
9      A.    No.
10      Q.    What part of this was she present for,
11  just when you were arrested?
12      A.    Yeah, like when he was searching me.
13          MR. GAINER:  All right.  Let's go off
14  the record.
15              (Whereupon a break was
16          taken.)
17  BY MR. GAINER:
18      Q.    So Courtney Turner was walking up when
19  you were being arrested?
20      A.    Yes, sir.
21      Q.    Do you have any knowledge, did she
22  ever tell you what part of this she saw?
23      A.    No.

## 169

1   Q.   Okay.  So you just think she's a
2   witness, based on the fact that she was walking
3   up when you were being arrested?
4   A.   Yes.
5   Q.   Did you ever hear her talk to either
6   of the police officers?
7   A.   No.
8   Q.   And you never talked to her about
9   this?
10  A.   No.
11  Q.   Anyone else other than Courtney Turner
12  and the people that I've already identified?
13  A.   That's it.
14  Q.   Your mom is listed as a witness in
15  this case.  Obviously she has knowledge about
16  this statement, because she was with you, right?
17  A.   Uh-huh.
18        MR. KSIAZEK:  You have to answer out
19  loud.
20        THE WITNESS:  Yes, sir.
21  BY MR. GAINER:
22  Q.   Okay.  Anything else that you can
23  think, or that you talked about with your mom

## 170

1   about this case that she would know about?
2   A.   No.
3   Q.   Okay.  All right.  Well, I think
4   that's all the witnesses then, right?  Can you
5   think of anybody else?
6   A.   That's it.  Everything is -- like,
7   this is getting really, really fresh.  That's it
8   though.
9        MR. GAINER:  All right.  Mr. Barber, I
10  think that's all the questions that I have.  I'm
11  going to look through this for about a minute,
12  make sure I didn't miss anything.  If you have a
13  couple, I'll just jump in after you.
14        MR. KSIAZEK:  Sure.  I'll just take a
15  minute myself.
16
17            EXAMINATION
18        BY MR. KSIAZEK
19  Q.   Let me ask this, you said your birth
20  date was February 14, 1991, right?
21  A.   Yes, sir.
22  Q.   And then this incident occurred in
23  December of 2005?

## 171

1   A.   Yes.
2   Q.   So how many years have passed between
3   1991 and 2005?
4   A.   Rephrase that.
5   Q.   Sure.  How many years was it between
6   2005 and 1991?
7   A.   15, 16 years, I think.
8   Q.   Okay.  Do you know if it's 14 years?
9   A.   14?
10  Q.   Yeah.
11  A.   Okay.
12        MR. GAINER:  Object to form.
13  BY MR. KSIAZEK:
14  Q.   Do you know if you were 14 at the time
15  when this happened?
16  A.   I really don't know my age around that
17  time.
18  Q.   All right.  I just want to clarify.
19  When you said that both yourself and Michael
20  Jones were placed in the cells, when you were at
21  the district --
22  A.   Uh-huh.
23        MR. GAINER:  Is that a yes?

## 172

1        THE WITNESS:  Yes, sir.
2        MR. GAINER:  Thanks.
3   BY MR. KSIAZEK:
4   Q.   -- who went into a cell first, you or
5   Mr. Jones?
6        MR. GAINER:  Objection to form, asked
7   and answered.
8        THE WITNESS:  Michael Jones.  He was
9   walking past as I was in front of the second
10  holding cell.  They put him in -- that's when
11  they put him in.
12  BY MR. KSIAZEK:
13  Q.   Did you suffer any pain when your face
14  hit the brick in the cell?
15  A.   Yes.
16  Q.   What did it feel like when your face
17  hit the brick in the cell?
18  A.   It just hurt a lot, and I really
19  didn't feel nothing other than I just know
20  everything went black.  All the light and
21  everything just went black after that.
22  Q.   Had you ever had any headaches like
23  the type you described on the record today, prior

173

1  to December 14, 2005?
2      A.   Yes.
3      Q.   You have?
4      A.   Yes.
5      Q.   When did you have headaches prior to
6  December 14, 2005?
7      A.   You saying -- prior means --
8      Q.   Before.
9      A.   Oh, no.  No.
10     Q.   So just to clarify, you haven't had
11  any headaches like the type you described before
12  December 14, 2005?
13     A.   Right.
14          MR. KSIAZEK:  That's all I have.
15          MR. GAINER:  Okay.  I have one or two
16  more.
17
18          FURTHER EXAMINATION
19          BY MR. GAINER
20     Q.   Can you go back to Exhibit No. 3,
21  please, which is that statement.  I want to talk
22  about the first page for a minute, the second
23  paragraph there.  I just want to note that -- you

174

1  see the part where it says, Barber, it starts
2  with Barber right down here?  See that, Barber
3  stated?
4      A.   Yes.
5      Q.   Okay.  Just below that, it's:  Barber
6  stated that the officer driver asked him his
7  name, he gave him his name, and this officer,
8  officer one, stated to him, fuck you and your
9  mama.  You see that?
10     A.   Yes.
11     Q.   And you told me about that, about the
12  driver and your altercation with him on the
13  street?
14     A.   Yes, sir.
15     Q.   Go to the next page, similar area,
16  which is down here, where it says, while at the
17  station -- this is the page that's marked 30 at
18  the bottom.
19     A.   Yes.
20     Q.   While at the station the passenger
21  officer, officer two, escorted him to the lockup
22  facility, pushed him upon opening the door on his
23  chest, causing him to fall on the floor.  Barber

175

1  stated that he could not get up, and officer two
2  grabbed him by the -- next page -- hoodie, and
3  dragged him, while on the floor, into the cell.
4  Once in the cell, officer two tried to pick him
5  up, and pushed him on his chest again, causing
6  him to strike his face and head on a concrete
7  bench located inside this cell.  You testified
8  earlier that the driver officer dragged you --
9      A.   I --
10     Q.   Let me finish -- dragged you into the
11  station, pushed you into the cell, and caused you
12  to hit your head.  The statement that you gave to
13  IPRA two days after this incident says that it
14  was the passenger officer.  Which one was it?
15     A.   They must have gotten the officers
16  mixed up, because it was the driver, one, the
17  officer one.  So I don't know why they got two
18  down there.
19     Q.   So the driver officer --
20     A.   That's number one.
21     Q.   So the driver officer is officer one?
22     A.   Yes.
23     Q.   And he's the one that pushed you in

176

1  the cell?
2      A.   Yes.
3      Q.   And dragged you through the corridor?
4      A.   Yes.
5      Q.   And the statement that you gave and
6  you signed to IPRA -- OPS, I'm sorry, on December
7  16, 2005, indicates that you told OPS that it's
8  officer two.  And you're testifying that you did
9  tell him that?
10          MR. KSIAZEK:  Objection,
11  mischaracterizes his testimony.
12  BY MR. GAINER:
13     Q.   Okay.  So you're testifying that you
14  did tell him that?
15     A.   Tell him what?
16     Q.   That it was officer two who did that?
17     A.   No, I didn't testify that it was
18  officer two.  I don't know if he misheard me
19  about certain things, but I'm for sure it was
20  officer one.
21     Q.   Are you for sure that you told the
22  investigator that it was the driver and not the
23  passenger?

| 177 |
|---|

1    A.   Yes.

2    Q.   So this is wrong then --

3    A.   Yes.

4    Q.   -- this part of the statement?

5    A.   Yes.

6         MR. GAINER:  Okay.  I don't have any

7  other questions.

8         MR. KSIAZEK:  I'm all done.  We'll

9  reserve signature.  I don't know how I'll get it

10  to him, but we'll reserve for now.

11             (Further deponent saith

12     not.)

13             (Signature reserved.)

14

15

16

17

18

19

20

21

22

23

| 178 |
|---|

1  STATE OF ILLINOIS   )

                 ) SS.

2  COUNTY OF WOODFORD  )

      C E R T I F I C A T E

3     I, Lisa Doerr, CSR, License #084-004304, DO

HEREBY CERTIFY that, pursuant to notice, there

4  came before me on January 25, 2010, at 100

Hillcrest Road, East Moline, Illinois, the

5  following named person to wit:

         TERRENCE BARBER,

6  who was by me first duly sworn to testify to the

truth and nothing but the truth of his knowledge

7  touching and concerning the matters in

controversy in this cause and that he was

8  thereupon carefully examined upon his oath, and

his examination immediately reduced to shorthand

9  by means of stenotype by me.

     I ALSO CERTIFY that the deposition is a

10  true record of the testimony given by the

witness, that the reading and signing of the

11  deposition by the said witness were expressly

reserved, but that the necessity of calling the

12  court reporter at time of trial for the purpose

of authenticating said transcript was waived.

13     I FURTHER CERTIFY that I am neither

attorney nor counsel for, nor related to, nor

14  employed by, any of the parties to the action in

which this deposition is taken, and, further,

15  that I am not a relative or employee of any

16  attorney or counsel employed by the parties

17  hereto, or financially interested in the action.

     IN WITNESS WHEREOF, I have hereunto set my

18

19  hand on February 4, 2010.

20

21

22

23       CSR License #084-004304

| 179 |
|---|

1         S I G N A T U R E   P A G E

2     THE UNITED STATES DISTRICT COURT

      NORTHERN DISTRICT OF ILLINOIS

3         EASTERN DIVISION

4

TERRENCE BARBER,         )

5                  )

    Plaintiff,       )

6                  )

     vs.        )  No. 08-CV-6363

7                )  Judge Anderson

P.O. Michael Malanluk (#11652),  )  Magistrate Judge Keys

8  P.O. Michael Shields (#5951),   )

  individually and THE CITY OF     )

9  CHICAGO,          )

10                 )

11    Defendants.     )

12

13

14     I, TERRENCE BARBER, do hereby certify that I have

15  read the foregoing transcript of the deposition taken on

16  January 25, 2010, before Lisa J. Doerr, C.S.R., and that

17  the questions and answers are true and correct, except as

18  may be noted on the attached sheet.

19

20

21

22         _____

23         TERRENCE D. BARBER

| 180 |
|---|

1          ERRATA SHEET

2  PAGE  LINE   CHANGE      REASON

3  ____  ____  _____     _____

4  ____  ____  _____     _____

5  ____  ____  _____     _____

6  ____  ____  _____     _____

7  ____  ____  _____     _____

8  ____  ____  _____     _____

9  ____  ____  _____     _____

10  ____  ____  _____     _____

11  ____  ____  _____     _____

12  ____  ____  _____     _____

13  ____  ____  _____     _____

14  ____  ____  _____     _____

15  ____  ____  _____     _____

16  ____  ____  _____     _____

17  ____  ____  _____     _____

18  ____  ____  _____     _____

19  ____  ____  _____     _____

20  ____  ____  _____     _____

21  ____  ____  _____     _____

22  ____  ____  _____     _____

23  ____  ____  _____     _____